# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ISAIAH GLENNDELL TRYON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-19-195-J |
| | ) | |
| JIM FARRIS, Warden, | ) | |
| Oklahoma State Penitentiary | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION</u>

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. [Doc. No. 27]. Petitioner challenges the conviction entered against him in Oklahoma County District Court Case No. CF-2012-1692. Tried by a jury in 2015, Petitioner was found guilty of first-degree murder and was sentenced to death. In support of the death sentence, the jury found four aggravating circumstances: (1) Petitioner had a prior violent felony conviction, (2) the murder was committed while Petitioner was serving a sentence of imprisonment for a felony conviction,[1] (3) there is a probability that Petitioner poses a continuing threat to society, and (4) the murder was especially heinous, atrocious, or cruel. Criminal Appeal Original Record ("O.R.") vol. VII, 1239.

---

[1] The OCCA invalidated this aggravating circumstance on direct appeal but concluded the aggravation outweighed the mitigation and supported the death sentence. *Tryon v. State*, 423 P.3d 617, 656-657 (Okla. Crim. App. 2018), *cert. denied*, 139 S. Ct. 1176 (2018).

Petitioner appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals ("OCCA"). The OCCA affirmed in a published opinion. *Tryon*, 423 P.3d at 625. Petitioner also filed an application for post-conviction relief, which the OCCA denied. *Tryon v. State*, No. PCD-2015-378 (Okla. Crim. App. Aug. 9, 2018). A successive application for post-conviction relief was also denied by the OCCA. *Tryon v. State*, No. PCD-2020-231 (Okla. Crim. App. March 11, 2021) (unpublished).

Petitioner now seeks habeas relief and presents eleven grounds for relief. Respondent has responded to the petition [Doc. No. 40] and Petitioner has replied [Doc. No. 50]. Petitioner also filed motions for discovery and an evidentiary hearing to which responses were filed [Doc. Nos. 29, 41, 42, 43]. Following the denial of Petitioner's successive application for post-conviction relief, the parties submitted supplemental briefing [Doc Nos. 56, 62, 63]. After a thorough review of the entire state court record (which Respondent has provided), the pleadings and materials submitted in this case, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to the requested relief.

## I. Facts

In adjudicating Petitioner's direct appeal, the OCCA set forth a summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted, the Court finds that Petitioner has not done so and that the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

On March 16, 2012, around 10:30 a.m., [Petitioner] fatally stabbed Tia Bloomer inside the Metro Transit bus station in downtown Oklahoma City. Tia recently broke off her relationship with [Petitioner] due in part to his inability to support their infant child. [Petitioner] was terminally unemployed and drew as income a meager $628.00 a month in Social Security disability benefits. The couple too had a stormy relationship. The day before her death—March 15, 2012—Tia called Detective Jeffrey Padgett of the Oklahoma City Police Department (OCPD) Domestic Violence Unit to schedule a follow-up interview for an assault case in which she was the named victim. Tia previously denied to authorities that [Petitioner] had assaulted her. Instead, she claimed another man had assaulted her.

During her phone conversation with Detective Padgett, Tia repeated this claim but agreed nonetheless to meet the next day. Later that night, Tia sent [Petitioner] a text message stating the following:

It's okay bc im [sic] going to tell the truth tomorrow. I'm tired of holding lies for yhu [sic]. Isaiah Tryon is the guy who choked nd [sic] nearly killed me Saturday.

(State's Ex. 38).

The next day, [Petitioner] accosted Tia inside the downtown bus station while she was talking on her cell phone. Surveillance video from inside the terminal showed [Petitioner] speaking to Tia before stabbing her repeatedly with a knife. Immediately before this brutal attack, an eyewitness heard Tia yell for Appellant to leave her alone. [Petitioner] then stabbed Tia in the neck with the knife, causing blood to gush out from her neck. The surveillance video shows [Petitioner] grabbing the victim then stabbing her when she tried to leave the terminal building. [Petitioner] stabbed the victim repeatedly after she fell to the floor. The victim said "help" as [Petitioner] continued stabbing her repeatedly and blood gushed out of her wounds. During the attack, several bystanders unsuccessfully attempted to pull [Petitioner] off the victim. At one point, a bystander can be seen on the surveillance video dragging [Petitioner] across the floor while [Petitioner] held on to Tia and continued stabbing her.

[Petitioner] released his grip on the victim only after Kenneth Burke, a security guard, sprayed him in the face with pepper spray. The security guard then forced [Petitioner] to the ground, handcuffed him and ordered the frantic crowd to move away both from [Petitioner] and the bloody scene surrounding the victim's body. A bloody serrated knife with a bent blade was found resting a short distance away on the floor.

While waiting for police to arrive, Burke checked on the victim but found no signs of life. Paramedics soon arrived and decided to transport the victim to the hospital because they detected a faint pulse. Despite the efforts of emergency responders, Tia died from her injuries. The medical examiner autopsied the victim and found seven (7) stab wounds to her head, neck, back, torso and right hand. Several superficial cuts were also observed on the victim's face and the back of her neck. The medical examiner testified these cuts were consistent with having been made by a serrated blade. The cause of death was multiple stab wounds. In addition to these injuries, the medical examiner observed redness and heavy congestion in the victim's eyes. The medical examiner did not associate this congestion with the victim's stab wounds but testified it is sometimes found in cases of strangulation.

OCPD Lieutenant Brian Bennett was one of the first officers on the scene. He removed [Petitioner] from the ground and escorted him out of the bus station. Because [Petitioner] had a great deal of blood on his hands and clothing, Lt. Bennett asked whether [Petitioner] needed medical treatment. [Petitioner] replied that he did not. [Petitioner] said he was not injured and all of the blood on him "was hers." [Petitioner] was nonetheless transported to nearby St. Anthony's Hospital where he was treated for cuts to his hand. When asked by a doctor about these injuries, [Petitioner] calmly responded that he had stabbed his girlfriend.

After being released from the hospital, [Petitioner] was transported to police headquarters. There, he was read the Miranda warning by OCPD Detective Robert Benavides and agreed to talk. During his interview, [Petitioner] admitted stabbing Tia repeatedly while inside the bus terminal. [Petitioner] said he stabbed the victim six times with a kitchen knife he brought from home. [Petitioner] explained that he and Tia recently broke up and that they had been fighting over his support of their infant son. When [Petitioner] saw Tia at the bus station, he walked up and tried to talk with her about their problems. Tia refused and told [Petitioner] to get away from her. That is when [Petitioner] said he pulled out his knife and began stabbing her.

[Petitioner] claimed he did not know Tia would be at the bus station that morning or that he would even see her that day. [Petitioner] did know, however, that Tia had some business to take care of that day. [Petitioner] admitted bringing the knife with him because if he saw Tia, he planned to stab her. [Petitioner] said Tia was facing him when he grabbed her and started stabbing her in the neck. [Petitioner] described how he continued stabbing Tia after she fell to the ground and how he kept hold of her arm. [Petitioner] said he was sad and depressed when he stabbed Tia because he didn't want

to be without her. Nor did he want anyone else to be with her. [Petitioner] did not believe he could find someone else to be with. [Petitioner] admitted that what he did to Tia "wasn't right." At one point during the interview, [Petitioner] demanded protective custody because "people ain't gonna like that type of shit" and would try to kill him in the county jail.

During the interview, [Petitioner] asked whether Tia was okay. Detective Benavides promised to let him know about Tia's condition as soon as he found out. When informed by Detective Benavides at the end of the interview that Tia did not survive her injuries and was dead, [Petitioner] showed no emotion to this news.

*Tryon*, 423 P.3d at 625-626.

## II.  Standard of Review

### A.  Exhaustion Requirement

The exhaustion doctrine is a matter of comity. It requires courts to consider in the first instance whether Petitioner has presented his grounds for relief to the OCCA. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991) ("… the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."). The doctrine is codified in 28 U.S.C. § 2254(b)(1), which provides that, aside from two narrow exceptions, habeas relief shall not be granted unless the remedies available in state court have been exhausted. Habeas relief may, however, be denied notwithstanding the failure of the Petitioner to exhaust state court remedies. *Id*. at § 2254(b)(2).

### B.  Procedural Bar

In addition to the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and

adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729. "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.

### C. Limited Merits Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") circumscribes the Court's review of claims that were adjudicated on the merits in state court proceedings. 28 U.S.C. § 2254; *see also Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011). Where the state court adjudicated a claim on the merits, this Court may reach the merits of the claim only if the petitioner can establish that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d)(2).

Clearly established federal law under § 2254(d)(1) refers to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" clearly established federal law if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413. A decision is an "unreasonable application" of clearly established federal law if

6

"the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

Under § 2254(d)(2), relief is only permitted when the state court's decision is "based on" the unreasonable factual determination. *Byrd*, 645 F.3d at 1172. An unreasonable factual determination is one that is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, (2003).

Importantly, the "question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Habeas relief is warranted only where there is no "possibility for fairminded disagreement" with the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 102-103 (2011). This standard was meant to be difficult and "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citation omitted). Finally, review of a claim under § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III.  Analysis

#### A. Ground One: Oklahoma's Capital Representation System and Counsel's Ineffective Assistance

##### 1. Systemic Problems Concerning Petitioner's Representation

In Ground One, Petitioner includes four subparts that describe alleged systemic deficiencies with Oklahoma's capital representation system. In subpart A, he asserts that

the Oklahoma County Public Defender's Office ("OCPDO") operates in such a way that trial and appellate attorneys cannot be considered separate, leading to a conflict of interest that prevents the appellate attorneys from objectively assessing trial counsel's performance on appeal. In subpart B, Petitioner argues that the OCPDO fails to provide capital defense teams that are sufficiently qualified or staffed. In subpart C, he asserts that a lack of funding inhibits capital defendants' ability to obtain adequate expert assistance and evaluation. Lastly, in subpart D, he asserts that the structure of Oklahoma's direct appeal and post-conviction system makes it more difficult for defendants to raise extra-record appellate claims.

Petitioner concedes that these allegations were not raised on direct appeal or in his original application for post-conviction relief but were only included in his second application for post-conviction relief. The OCCA denied these claims as barred by Okla. Stat. tit. 22, § 1089(D) "because they either were or could have been raised in Petitioner's original application for post-conviction relief." *Tryon*, PCD-2020-231, slip op. at 6.

Ordinarily, federal courts cannot consider claims on habeas review when the state court barred those claims pursuant to an independent and adequate state procedural rule. *Harmon v. Sharp*, 936 F.3d 1044, 1060 (10th Cir. 2019). When adequacy and independence are met, a petitioner can nevertheless overcome the procedural bar by demonstrating either cause for the default and actual prejudice stemming from an alleged violation of federal law or that the federal court's failure to consider the matter would result in a fundamental miscarriage of justice. *Id*. Here, Petitioner claims that the state procedural rule is not independent and adequate, and that he can show cause and prejudice to excuse the default.

8

### a. Adequate and Independent State Procedural Rule

A state's procedural rule is adequate if it is "strictly or regularly followed and applied evenhandedly to all similar claims." *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 900 (10th Cir. 2019) (internal quotation marks omitted). The burden of proving the adequacy of a state procedural bar rests with the state. *Id.* The procedural bar is independent "if it relies on state law, rather than federal law, as the basis for the decision." *Banks v. Workman*, 692 F.3d 1133, 1145 (10th Cir. 2012) (internal quotation marks omitted).

Here, Petitioner attacks both the adequacy and the independence of the procedural rule relied on by the OCCA in finding his claims procedurally barred. He argues that the rule is not adequate because the OCCA has, on a handful of occasions, exercised its discretion to review the merits of an otherwise barred claim to avoid a fundamental miscarriage of justice. *See, e.g., Valdez v. State,* 46 P.3d 703 (Okla. Crim. App. 2002). He also argues that the rule is not independent of federal law because in declining to exercise its discretion to review barred claims, the OCCA necessarily reviewed the merits of any underlying federal claims. The Tenth Circuit has previously rejected similar arguments and held that Oklahoma's procedural rule is independent and adequate. *See Fairchild v. Trammell,* 784 F.3d 702, 719 (10th Cir. 2015); *Banks,* 692 F.3d at 1145-47; *Thacker v. Workman*, 678 F.3d 820, 835-36 (10th Cir. 2012). This Court is obliged to follow the Tenth Circuit's rulings and conclude that Petitioner's arguments do not undermine the adequacy or independence of Oklahoma's procedural rule.

Petitioner additionally challenges the adequacy of the procedural rule by claiming that a conflict of interest prevented direct appeal counsel from raising potentially

meritorious ineffective assistance of trial counsel claims. The conflict, Petitioner explains, is the result of direct appeal counsel and trial counsel both working out of the same office for the same employer.

A conflict of interest that renders Oklahoma's procedural bar inadequate "exists when trial and appellate counsel are one and the same." *Cuesta-Rodriguez*, 916 F.3d at 900. However, "different attorneys from the same public defender's office may, under certain circumstances, constitute separate counsel." *Harmon*, 936 F.3d at 1061. In *Harmon*, the Tenth Circuit found that "appellate public defenders from the Oklahoma County Public Defender's Office have repeatedly raised ineffective assistance of trial counsel arguments based on the conduct of attorneys from that office" which is "strong evidence" that they are separate counsel. *Id.* at 1062. Similarly, in *Cuesta-Rodriguez*, 916 F.3d at 901-02, the Tenth Circuit found that Oklahoma's procedural bar was adequate even though the petitioner's trial and appellate attorneys worked "'just down the hall' from each other" at the OCPDO.

Petitioner principally claims that counsel were impermissibly intertwined because they worked out of the same office and the trial attorneys could consult with the appellate attorneys about legal issues. Petitioner has not, however, presented evidence suggesting that "a relationship to trial counsel hindered his appellate counsel." *Id.* at 902; *see also Carter v. Gibson*, 27 F. App'x 934, 943 (10th Cir. 2001) (unpublished) (finding procedural bar inadequate when appellate counsel failed to raise ineffective assistance of trial counsel and trial counsel assisted in writing the appellate brief). The mere fact that the trial attorneys consulted with the appellate attorneys on legal issues does not render trial and

appellate counsel one and the same, particularly given the OCPDO's history of raising ineffective claims on direct appeal. *See Cannon v. Mullin,* 383 F.3d 1152, 1173–74 (10th Cir. 2004)*, abrogated on other grounds by Simpson v. Carpenter,* 912 F.3d 542, 576 n.18 (10th Cir. 2018) (explaining that a "history of raising ineffective-assistance claims could allay concerns" regarding whether attorneys from the same office should be deemed separate.) Accordingly, the Court finds that Oklahoma's procedural bar is adequate and independent.

### b. Cause and Prejudice

Where a habeas petitioner has defaulted a claim, federal review is prohibited unless he can show cause for the default and prejudice. *Simpson*, 912 F.3d at 571. "To establish 'cause,' a petitioner must show that 'some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule.'" *Id.* (quoting *Scott v. Mullin*, 303 F.3d 1222, 1228 (10th Cir. 2002)). This typically requires showing that "'the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable.'" *Id.* (quoting *Scott*, 303 F.3d at 1228). Here, Petitioner argues that appellate counsel's conflict of interest and post-conviction counsel's inability to obtain adequate funding show cause sufficient to excuse his procedural default.

The problem with this argument is that "ineffective representation in state post-conviction proceedings is inadequate to excuse a procedural default." *Spears v. Mullin*, 343 F.3d 1215, 1255 (10th Cir. 2003). Further, the Tenth Circuit recently rejected arguments that Oklahoma's public defender system denies defendants the opportunity to effectively raise ineffectiveness claims. *See Cuesta-Rodriguez*, 916 F.3d at 904-05; *see also Pavatt v.*

*Carpenter*, 928 F.3d 906, 934 (10th Cir. 2019) (holding that unique circumstance where petitioner was represented by the same attorney at trial and on appeal did not establish an exception to the procedural bar rule). Accordingly, the failure of Petitioner's first post-conviction counsel to raise the claims he now seeks to assert does not provide cause to excuse his procedural default.

### c. Conclusion

The OCCA applied an independent and adequate state procedural bar to the allegations raised in parts A, B, C and D of Ground One and Petitioner has not presented cause to excuse the default. These subclaims are therefore denied as procedurally barred.

### 2. Failure to Pursue Intellectual Disability Defense

In the remainder of Ground One, Petitioner raises several specific challenges to counsel's performance. His first challenge focuses on trial and appellate counsel's treatment of his intellectual disability defense and includes two closely related subclaims. In the first subclaim, he argues that appellate and trial counsel performed deficiently by failing to pursue a constitutional challenge to Oklahoma's intellectual disability defense statute. In the second subclaim, Petitioner argues that appellate counsel performed deficiently by failing to raise a claim premised on trial counsel's failure to investigate and present evidence of Petitioner's intellectual disability.[2]

---

[2] In his supplemental briefing, Petitioner argues that the additional evidence of intellectual disability submitted in his second post-conviction application should be excused from a procedural default because a failure to consider it would result in a miscarriage of justice. The miscarriage of justice exception "applies to those who are 'actually innocent' of the crime of conviction and those 'actually innocent' of the death penalty (that is, not eligible for the death penalty under applicable law)." *Black*, 682 F. 3d at 915. To prevail on a claim

### a. Procedural and Factual Background

#### i. Oklahoma's Intellectual Disability Statute

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's prohibition on "cruel and unusual punishments" forbids the execution of intellectually disabled criminal defendants. However, "recognizing that 'serious disagreement' could exist regarding who should be deemed so intellectually disabled as to be categorically excluded from execution, the Court 'le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction.'" *Smith v. Duckworth*, 824 F.3d 1233, 1243 (10th Cir. 2016) (quoting *Atkins*, 536 U.S. at 317) (alterations in original).

Oklahoma implemented *Atkins'* mandate by enacting Okla. Stat. tit. 21, § 701.10b.[3] This statute provides that a defendant is intellectually disabled – and therefore ineligible for the death penalty – if he can prove three elements: "significantly subaverage general intellectual functioning, significant limitations in adaptive functioning, and that the onset

_____

of actual innocence of the death penalty, a petitioner "'must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under applicable state law.'" *Id*. quoting (*Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). This "very narrow exception" applies to "actual or factual innocence, as opposed to legal innocence." *Klein v. Neal*, 45 F.3d 1395, 1400 (10th Cir. 1995). In a capital sentencing context, this requires a defendant to "show the absence of aggravating circumstances or some other condition of eligibility." *Black*, 682 F.3d at 915. Given the denial of Petitioner's intellectual disability claim, the Court finds that the miscarriage of justice exception is not satisfied.

[3] Oklahoma first defined intellectual disability in *Murphy v. State*, 54 P.3d 556 (Okla. 2002) *overruled by Blonner v. State*, 127 P.3d 1135 (Okla. 2006). The statute supplanted this definition and was the governing law at the time of Petitioner's trial.

of the mental retardation[4] was manifested before the age of eighteen (18) years." *Id.* at §

701.10(b)(C). Regarding the first element, the statute provides that "[a]n intelligence

quotient of seventy (70) or below on an individually administered, scientifically recognized

standardized intelligence quotient test administered by a licensed psychiatrist or

psychologist is evidence of significantly subaverage general intellectual functioning" and

that "the standard measurement of error for the test administrated shall be taken into

account." *Id.* Of crucial import to this case, the statute also includes a bright-line cut off

score: "in no event shall a defendant who has received an intelligence quotient of seventy-

six (76) or above on any individually administered, scientifically recognized, standardized

intelligence quotient test administered by a licensed psychiatrist or psychologist, be

considered mentally retarded and, thus, shall not be subject to any proceedings under this

section." *Id.* Oklahoma has interpreted an IQ score above 76 as excluding a finding of

intellectual disability even if a lower score is also available. *Smith v. State*, 245 P.3d 1233,

1237 (Okla. Crim. App. 2010).

### ii. *Trial and Direct Appeal*

Trial counsel engaged Dr. John Fabian, a clinical psychologist and

neuropsychologist, to examine Petitioner's neuropsychological functioning and evaluate

potential mitigating factors that could be presented at trial. Trial Ct. Ex. 6 at 1. In his report

dated November 7, 2014, Dr. Fabian indicated that Petitioner received a full-scale

---

[4] The statute has since been amended to use the term "intellectual disability" rather than "mental retardation." The Supreme Court also formerly employed the phrase "mentally retarded," but now "uses the term 'intellectual disability' to describe the identical phenomenon." *Hall*, 572 U.S. at 704. The Court also uses the term "intellectual disability."

intelligent quotient of 68 on the Wechsler Adult Intelligence Scale-IV (WAIS-IV). *Id*. at 13. Dr. Fabian advised that Petitioner should "be considered" for an intellectual disability evaluation given his "low intelligence and current IQ of 68." *Id*. at 38. Significantly, Dr. Fabian's report also indicates that Petitioner received a full-scale IQ of 81 when he was administered the Weschler Intelligence Scale for Children-III (WISC-III) at the age of fourteen and that he did not believe Petitioner qualified historically for a diagnosis of intellectual disability. *Id*. at 10, 35, 37.

Following the report, trial counsel gave notice of an intellectual disability defense and filed a motion seeking to continue the trial date. O.R. 909-912; 916-919. At the hearing for the motion to continue, trial counsel argued that further evaluation and testing was necessary because Petitioner received an IQ score of 68 and Oklahoma's statute indicates that an IQ score of 70 or below is evidence of significantly subaverage intellectual functioning. Hr'g Tr. dated December 18, 2014 at 3-5. The State objected to the continuance and argued that Petitioner's prior IQ score of 81 precluded him from pursuing an intellectual disability defense given the statute's firm 76 point cut off. *Id.* at 7-9. The trial court rejected Petitioner's Notice of Intent to Raise Intellectual Disability and denied the motion to continue. *Id.* at 19.

At trial, defense counsel re-urged their request for an *Atkins* hearing and argued that Oklahoma's statute is unconstitutional. Trial Tr. vol. V, 1191. The trial court denied the request. *Id.* at 1192. The defense then presented Dr. Fabian during the mitigation stage and he provided lengthy testimony regarding Petitioner's psychological and neuropsychological functioning. He specifically testified that there was evidence that

Petitioner was "low functioning," that he received an IQ score of 81 at the age of fourteen which would place him in the borderline range of intellectual functioning, and that he received a more recent IQ score of 68 which would place him in the "mild mentally retarded range." Trial Tr. VII, 1664, 1668-1670. When asked to account for the differences in those scores, Dr. Fabian testified that "I don't believe [Petitioner] is mentally retarded. So it's my opinion that that score with me is a bit low." *Id.* at 1671. Dr. Fabian went on to testify that head injuries or drug use could explain the change in IQ scores. *Id.* at 1672-1675. He further testified that "[Petitioner] functions likely somewhere in the borderline range of intelligence" and "he's low functioning and certainly not mentally retarded." *Id.* at 1683-1684. On cross-examination, Dr. Fabian stated that he told defense counsel he "did not believe Petitioner was mentally retarded," but with an IQ score of 68 they "should consider looking into it further and they said they would consider that." *Id.* at 1726.

On direct appeal, Petitioner's counsel raised twenty grounds for relief but did not challenge trial counsel's effectiveness or the constitutionality of Oklahoma's intellectual disability statute. *See* Appellant's Brief, D-2015-331. The OCCA affirmed the conviction and sentence on direct appeal, although appellate counsel succeeded in having one of the aggravating circumstances struck. *See Tryon,* 423 P.3d at 650.

### *iii.    Post-Conviction Proceedings*

Post-conviction counsel argued, *inter alia*, that appellate counsel performed deficiently by failing to raise an ineffectiveness claim based on trial counsel's failure to further pursue an *Atkins* claim. *See* Original Appl. for Post-Conviction Relief at 31-41. Embedded within this claim was an attack on the constitutionality of Oklahoma's statute.

16

Specifically, post-conviction counsel asserted that Oklahoma's practice of precluding further inquiry into intellectual disability based on a single score above 75 "is contrary to *Atkins* and its progeny" and requested that the court "allow his *Atkins* status inquiry to continue." *Id*. at 35-36.

The OCCA held that Petitioner could show neither deficient performance nor prejudice because his IQ score of 81 foreclosed an intellectual disability defense under Oklahoma's statutory scheme. *Tryon*, PCD-15-378, 17-19. Because the score is above the 76-point cutoff even when adjusted for the standard error of measurement, the OCCA reasoned that neither appellate nor trial counsel were ineffective for failing to further pursue an intellectual disability defense. *Id.* at 18-19.

### b. Adjudication on the Merits

As a threshold matter, Petitioner argues that the OCCA did not adjudicate the merits of his constitutional challenge to the statute and that aspect of the claim is therefore not entitled to AEDPA deference. Petition at 21. The burden of showing that a claim has not been adjudicated on the merits lies with the defendant. *Fairchild v. Trammell*, 784 F.3d 702, 711 (10th Cir. 2015). Notably, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99; *see also Johnson v. Williams*, 568 U.S. 289, 300-301 (2013).

In resolving Petitioner's ineffectiveness claim the OCCA broadly held that Petitioner's IQ score foreclosed his intellectual disability defense because it was above

Oklahoma's statutory cutoff even when accounting for the standard error of measurement. *Tryon*, PCD-15-378, 17-18. In reaching this conclusion, the OCCA cited to Supreme Court precedent addressing the constitutionality of other intellectual disability statutes and explicitly rejected Petitioner's invitation to adjust the score downward using the Flynn Effect.[5] *Id.* The OCCA ultimately concluded that neither trial nor appellate counsel were ineffective for failing to pursue an intellectual disability defense given that Petitioner's IQ score was above the cutoff and the defense's own expert testified that Petitioner was not intellectually disabled. *Id.* at 18-19.

Thus, the OCCA adjudicated Petitioner's ineffectiveness claim on the merits. Denial of that claim also involved a rejection of post-conviction counsel's assertion that the statute was contrary to *Atkins*. AEDPA deference "applies not only to claims the state court squarely addressed, but also to claims it reached only cursorily." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 740 (10th Cir. 2016). Although the OCCA did not discuss the constitutional attack on the statute in detail, their citation to Supreme Court precedent analyzing intellectual disability statutes suggests that they considered Petitioner's

---

[5] The Flynn Effect is a theory "which proposes that the mean IQ score of a population increases at a rate of approximately 0.3 points per year....Under this theory, the result of an IQ test must be adjusted to account for how long ago the test was 'normed,' or compared to a representative population at that time. In theory, because the mean IQ goes up over time, a test normed years before it is given will return an inflated score relative to the current mean IQ of the population—the yardstick against which intellectual disability is measured. Accordingly, proponents of the Flynn Effect argue IQ scores must be adjusted downward by 0.3 points for each year that has passed since the test was normed to arrive at a proper measure of the test taker's IQ. Scientific and legal acceptance of this theory is mixed." *Duckworth*, 824 F.3d 1233, 1244 (10th Cir. 2016) (internal citations omitted).

constitutional challenge to the statute and rejected it. At the very least, Petitioner cannot overcome the presumption that all aspects of his ineffective assistance of counsel claim were adjudicated on the merits. *See Postelle v. Carpenter*, 901 F.3d 1202, 1214 n. 7 (applying AEDPA deference to a claim that the OCCA did not comment on because federal habeas courts must "presume that the [state] court silently rejected remaining claims on the merits.").

### c. Clearly Established Law

The clearly established law that governs Petitioner's ineffective assistance of counsel claim is the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* requires a defendant to show both that his "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.* On habeas review, courts must apply the highly deferential standards of *Strickland* and AEDPA to the facts of the case and decide whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S. at 105. A state court's ruling cannot be disturbed unless the petitioner demonstrates that the state court applied the *Strickland* test in a way that every fair-minded jurist would agree was incorrect. *Id*.

Regarding deficient performance, the Supreme Court has held that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. To avoid the "distorting effects of hindsight," an attorney's conduct should be judged "from counsel's perspective at the time." *Id*. at 689-90. Review of an attorney's performance is highly deferential and there

is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690.

Prejudice exists where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "If the alleged ineffective assistance occurred during the guilt stage, the question is whether there is a reasonable probability the jury would have had reasonable doubt regarding guilt." *Moore v. Gibson*, 195 F.3d 1152, 1178 (10th Cir. 1999). When the alleged ineffective assistance occurs during the sentencing stage of a capital trial, the court must consider "whether there is a 'reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Id.* (quoting *Strickland*, 466 U.S. at 695). In evaluating prejudice, courts must look "at the totality of the evidence, not just the evidence helpful to the petitioner." *Id*.

*Strickland's* standard also governs claims of ineffective assistance of appellate counsel. *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001). When analyzing a claim of ineffective assistance of appellate counsel for failure to raise an issue, courts "look to the merits of the omitted issue." *Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999). Deficient performance may be established if appellate counsel omitted an issue that is "so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). If appellate counsel fails to raise a claim that has some merit, but is not compelling, courts must view the issue in light of the rest of the appeal and give deference to counsel's

professional judgment. *Id*. Even if a petitioner succeeds in the difficult task of identifying a meritorious claim that appellate counsel neglected, he must still demonstrate that absent the appellate counsel's deficient performance, there is a reasonable probability that the petitioner would have prevailed on appeal. *Smith*, 528 U.S. at 285.

### d. Analysis

> #### i. *Abandoning Claim that Petitioner is Ineligible for the Death Penalty*

Petitioner first argues trial and appellate counsel performed deficiently by failing to raise a constitutional challenge to Oklahoma's statute which, if successful, would have rendered him ineligible for the death penalty. Petition at 13-16. Petitioner asserts that an effective attorney would have known to challenge the statute because it disregards current clinical standards by adopting a firm cut-off based on a single IQ score and fails to account for the Flynn Effect. *Id.* at 16-17. Petitioner claims that the failure to bring the statute in compliance with clinical standards runs afoul of *Atkins*, *Hall v. Florida*, 572 U.S. 701 (2014), *Brumfield v. Cain*, 576 U.S. 305 (2015), *Moore v. Texas*, ___ U.S. ___, 137 S. Ct. 1039, (2017) (*Moore I*), and *Moore v. Texas*, ___ U.S. ___, 39 S. Ct. 666 (2019) (*Moore II*).[6] *Id.* at 17-20.

At issue in *Hall* was an intellectual disability statute that required the defendant to present "an IQ test score of 70 or below before presenting any additional evidence of his

---

[6] Neither *Moore I* nor *Moore II* had been decided at the time appellant counsel filed the direct appeal brief. Accordingly, these cases are of limited value in determining whether appellate counsel performed deficiently in failing to pursue this defense. Additionally, *Moore II* had not been decided at the time the OCCA denied Petitioner's post-conviction application and it is therefore irrelevant to determining the clearly established law.

intellectual disability." *Hall*, 571 U.S. at 707. The Supreme Court struck down the statute and held that "where an IQ score is close to, but above, 70, courts must account for the test's 'standard error of measurement.'" *Moore I*, 137 S. Ct. at 1049 (quoting *Hall,* 571 U.S. at 713, 723). In reaching this conclusion, the Supreme Court recognized that "clinical definitions of intellectual disability…were a fundamental premise of *Atkins*" and those definitions "have long included the SEM." *Hall*, 571 U.S. at 720. However, *Hall* "expressly excluded from its analysis 'the rule in States which use a bright-line cutoff at 75 or greater' because the petitioner had not challenged the higher IQ cutoff." *Smith v*, 824 F.3d at 1246 n. 8 (citing *Hall*, 571 U.S. at 715). *Hall*, therefore, cannot "be read as more broadly prohibiting the application of Oklahoma's IQ cutoff score of 76." *Id.* at 1246, n.8.

In *Brumfield,* the Supreme Court held that it was factually unreasonable for the state court to conclude that an IQ score of 75 precluded an intellectual disability finding. *Brumfield,* 576 U.S. at 316 (2015). Relying on *Hall*, the Court noted that the defendant's IQ score of 75 was within the range of potential intellectual disability when accounting for the standard error of measurement. *Id*. at 315. Thus, like *Hall*, *Brumfield* says nothing about the correctness of adopting a cutoff score above the standard error of measurement, the Flynn Effect, or the use of multiple scores.

Finally, in *Moore I*, which did not arise under AEDPA, the Supreme Court rejected Texas' use of nonclinical factors untethered to any medical guidance and held that, consistent with *Atkins* and *Hall*, an intellectual disability "determination must be 'informed by the medical community's diagnostic framework.'" *Moore I*, 137 S. Ct. at 1053 (quoting *Hall*, 572 U.S. at 721). The Court continued to recognize, however, "that being informed

22

by the medical community does not demand adherence to everything stated in the latest medical guide." *Id.* at 1049. Following remand to reevaluate the defendant's intellectual disability claim, the Supreme Court in *Moore II* found that the state court once again relied too heavily on the same nonclinical factors and analysis that it previously found to be improper. *Moore II*, 139 S. Ct. at 672.

Taken together, these cases establish that an intellectual disability determination must be informed by current medical standards and that an IQ cutoff score must account for the standard error of measurement. None of these cases specifically address the alleged flaws Petitioner identifies in Oklahoma's statute, i.e. use of a cutoff score that is above the standard error of measurement, the Flynn Effect, or the effect of multiple IQ scores. *See Duckworth*, 824 F.3d at 1244-1246 (explaining that *Hall* "focuse[d] exclusively" on the SEM and denying habeas relief where the petitioner argued that Oklahoma's IQ cutoff is contrary to *Atkins*).

For purposes of AEDPA, clearly established federal law "refers to the holdings, as opposed to the dicta" of the Supreme Court's decisions. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (internal quotation omitted). These holdings "must be construed narrowly and consist only of something akin to on-point holdings." *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008). Where the Supreme Court's cases "give no clear answer to the question presented," there cannot be an unreasonable application of clearly established federal law. *Wright v. Van Patten*, 552 U.S. 120, 126, (2008); *see also Carey v. Musladin*, 549 U.S. 70, 77 (2006). Further, "[t]he more general the rule, the more leeway courts have in reaching

outcomes in case-by-case determinations." *Richter*, 562 U.S. at 101 (internal quotation omitted).

Here, no decision of the Supreme Court "squarely addresses" the purported flaws Petitioner identifies in the statute. *Wright*, 552 U.S. at 125. And, notably, the Tenth Circuit rejected a similar (although not identical) challenge to Oklahoma's statute in *Smith*, 824 F.3d at 1244-1246. *See also Postelle*, 901 F.3d at 1212 (rejecting ineffectiveness claim based on appellate counsel's failure to use Flynn Effect evidence to argue that defendant was ineligible for the death penalty). Further, the statute's 76-point cutoff is consistent with *Atkins's* explanation that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. at 309 n. 5.[7] Although the statute may not have adopted every current clinical practice, "adherence to everything stated in the latest medical guide" is not required. *Moore*, 137 S. Ct. at 1049. In short, Petitioner has failed to meet his burden of showing that there is no room for fairminded disagreement as to whether Oklahoma's intellectual disability statute falls outside the range of discretion permitted by *Atkins*.

Petitioner has likewise failed to show that the OCCA unreasonably concluded that appellate counsel was not ineffective for failing to challenge the statute. Appellate counsel knew from the trial record that Petitioner had an IQ score above the statutory cutoff and

---

[7] The most current version of the Diagnostic and Statistical Manual of Mental Disorders likewise states that "[i]ndividuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65-75." Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013).

that the defense expert believed Petitioner was "certainly not mentally retarded." Trial Tr. VII, 1683-1684. Faced with that testimony, a reasonable appellate attorney could have decided that a claim based on Petitioner's ineligibility for the death penalty needed to be winnowed out from the appeal. *See Cargle*, 317 F.3d at 1202. This is particularly true given the Tenth Circuit's rejection of a similar claim in *Smith,* 824 F.3d at 1244-1246.

ii.    *Investigation and Presentation of Intellectual Disability Evidence*

In his second subclaim, Petitioner argues that trial and appellate counsel performed deficiently by failing to adequately investigate and present evidence of Petitioner's intellectual disability. Petition at 23. He asserts that trial counsel failed to pursue an intellectual disability evaluation despite compelling evidence that Petitioner meets the criteria and Dr. Fabian's recommendation that an evaluation be completed, and appellate counsel unreasonably failed to raise these errors on direct appeal. *Id.* at 23-30.

Dr. Fabian's expert report opined that he did not believe Petitioner qualified historically for a diagnosis of intellectual disability but that he should be considered for an evaluation given his more recent IQ score of 68. Ct. Ex. 6. Based on this report, trial counsel pursued the intellectual disability claim by giving notice of the defense and requesting a continuance to further evaluate Petitioner. O.R. 909-912; 916-919. Following the trial court's denial of Petitioner's request, a reasonable attorney, knowing she must balance limited resources, *Richter*, 562 U.S. at 107, could decide that an intellectual disability evaluation was not warranted. After all, trial counsel knew that Petitioner did not qualify for an intellectual disability defense under Oklahoma's statute and the defense's own

expert opined that he did not qualify historically for intellectual disability.[8] Further, although trial counsel did not complete a full-blown intellectual disability evaluation, she did present evidence of Petitioner's low intelligence score and other deficits through Dr. Fabian's trial testimony. *See* Trial Tr. vol. VII at 1664-1667. Given Dr. Fabian's opinion and Petitioner's IQ score above the statutory cutoff, the OCCA could very reasonably conclude that appellate counsel did not perform deficiently, and Petitioner was not prejudiced, by appellate counsel's omission of a claim based on trial counsel's failure to present additional evidence of intellectual disability.

In challenging the OCCA's finding of no deficient performance and no prejudice, Petitioner points to two factual determinations that he claims are unreasonable. First, Petitioner argues that "OCCA wrongly equates an *IQ test* with an *ID determination* in stating '[t]he problem with this claim is that Dr. Fabian testified at trial that Petitioner was not mentally retarded.'" Petition at 31 (emphasis in original). But Dr. Fabian indisputably *did* testify at trial that Petitioner was not mentally retarded. Petitioner's real argument appears to be that the OCCA failed to consider Petitioner's adaptive functioning deficits or IQ score of 68 and simply foreclosed the intellectual disability claim based on the IQ score above the statutory cutoff. However, as previously explained, *infra* at part A(2)(d)(I), there

---

[8] Petitioner additionally suggests that the failure to complete an intellectual disability evaluation was influenced by a lack of funding for expert witnesses. Petition at 24. If trial counsel was concerned about acquiring the necessary funds, it did not stop her from giving notice of the defense and seeking the trial court's permission to further explore the issue. Given that she sought a continuance to further develop an intellectual disability defense, it seems likely that trial counsel believed she could somehow obtain funding for an evaluation if the trial court had granted the defense's motion.

is no clearly established law prohibiting the use of a single cut-off score above the standard error of measurement.

Second, Petitioner argues that "the OCCA's unflinching reliance on its previous conclusions that the Flynn Effect is irrelevant resulted in an unreasonable determination of fact, i.e., '[p]etitioner's IQ score of 81 foreclosed the mental retardation claim he now envisions.'" Petition at 31-32. Of course, Petitioner's IQ score of 81 *did* foreclose the intellectual disability claim pursuant to state law, and the OCCA's conclusion that an IQ score should not be adjusted to account for the Flynn Effect is not an unreasonable one. *Duckworth*, 824 F.3d at 1246.

Petitioner also relies on *Brumfield* in arguing that the OCCA made unreasonable factual determinations by precluding the intellectual disability defense, but that case is distinguishable. In *Brumfield*, the state court's conclusion that the defendant's reported IQ score of 75 was inconsistent with a diagnosis of intellectual disability was held to be an unreasonable determination of fact because, accounting for the standard error of measurement, this score was within the range of potential intellectual disability. *Id.* at 315-316. There was no evidence "of any higher IQ test score that could render the state court's determination reasonable" and the state had not adopted a firm cutoff like Oklahoma's. *Id.* at 316. Here, however, Petitioner's IQ score of 81, even when adjusted for the standard error of measurement, is not within the range typically associated with intellectual disability. *See Atkins*, 536 U.S. at 309, n. 5. And although Petitioner has another score that would place him in the range associated with intellectual disability, Oklahoma's statutory scheme precludes further consideration of an intellectual disability defense based on a

single score above the cutoff.  Accordingly, the OCCA's determination that Petitioner's IQ score foreclosed his intellectual disability defense pursuant to state law cannot be an unreasonable factual determination.

### e.  Conclusion

The OCCA concluded that neither trial nor appellate counsel were ineffective for failing to do more to pursue an intellectual disability defense. Petitioner has failed to show that this conclusion was unreasonable. Accordingly, relief is denied.

### 3. Mitigating Evidence Related to Traumatic Brain Injury

Petitioner next argues that appellate counsel erred in failing to raise a claim based on trial counsel's failure to investigate and present evidence of Petitioner's traumatic brain injury. More specifically, Petitioner asserts that trial counsel's failure to present evidence of (1) his history of suicide and headbanging and (2) a pair of vehicle accidents in which Petitioner suffered head injuries rendered her ineffective.

Neither of these arguments swayed the OCCA on post-conviction. As to the history of suicide and headbanging, the OCCA found that trial counsel did not perform deficiently under *Strickland* in declining to emphasize this evidence. *Tryon*, PCD-2015-378 at 12. As to the vehicle accidents, the OCCA found that Petitioner could not show *Strickland* prejudice as a result of trial counsel's failure to present additional testimony concerning these incidents. *Id.* at 15. Because the OCCA did not reach a decision regarding the deficient performance prong of the headbanging subclaim or the prejudice prong of the vehicle accidents subclaim, this Court's review of those prongs is *de novo*. *See Wiggins v. Smith,* 539 U.S. 510, 534 (2003). Of course, under AEDPA, this Court's review of the

28

adjudicated prongs is most deferential and habeas relief can only be afforded if the state court's decision was unreasonable. *See* 28 U.S.C. § 2254(d).

Although Petitioner raises a number of factual challenges to the adjudicated prongs of *Strickland*, he fails to explain why he is entitled to relief on the unadjudicated prongs. *Strickland's* familiar two-part test provides the clearly established law that controls this claim, *see* part A(2)(c), and it requires that a petitioner show both deficient performance and prejudice to establish ineffective assistance of counsel. *Strickland*, 466 U.S. at 687. Failure to satisfy either prong is dispositive. *Id.; see also Hooks v. Workman*, 689 F.3d 1148, 1186 (10th Cir. 2012). Thus, even assuming Petitioner can overcome AEDPA's hurdle as to the adjudicated prongs, his failure to establish that he was prejudiced by trial counsel's omission of additional headbanging evidence[9] or that trial counsel performed deficiently in not presenting additional evidence of the vehicle accidents is fatal to his ineffective assistance of counsel claim. *See Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013) ("Even a capital defendant can waive an argument by inadequately briefing an issue"). At any rate, Petitioner cannot surmount his burden of showing that the OCCA's legal or factual conclusions as to the adjudicated prongs are unreasonable.

Petitioner first asserts that the OCCA unreasonably concluded that an adolescent suicide attempt by Petitioner was "not credible." At trial, counsel presented evidence of

---

[9] Although Petitioner makes some broad assertions about the significance of evidence related to traumatic brain injury in explaining his impulsive behavior on the day of the murder, he does not explain how additional evidence of suicide attempts or headbanging would establish a reasonable probability of a different sentencing outcome. *See Strickland*, 466 U.S. 668 at 694.

Petitioner's headbanging and suicide attempts through the testimony of Dr. Fabian and Dr. David Musick. Dr. Musick, a sociologist, testified that Petitioner would bang his head against the wall from childhood through adolescence and experienced three suicide attempts. Trial Tr. vol. VIII, 1835-1840. He also testified that Petitioner experienced several traumatic brain injuries which can lead to a number of serious behavioral issues. *Id.* at 1836. Similarly, Dr. Fabian testified that Petitioner engaged in repetitive headbanging and had several suicide attempts. *Id.* at vol. VII, 1675, 1682-1683. During cross-examination of Dr. Fabian, the prosecutor elicited testimony that a medical report documenting a June 24, 2004 suicide attempt indicated that Petitioner told the treating psychologist that the "main reason he did this was to get out of detention." *Id.* at 1710-1712. Given that evidence, the Court cannot say that the OCCA's conclusion that the suicide attempt was not credible is "more than just 'debatable' but altogether 'unreasonable.'" *Grant*, 727 F.3d at 1025 (quoting *Wood*, 558 U.S. at 303).

Petitioner also challenges the OCCA's conclusion that the June 2004 suicide attempt "was the only documented one." *Tryon*, PCD-15-378, at 12. Petitioner argues that this conclusion was false because he actually has a well-documented history of suicide attempts. Petition at 35. The problem with this assertion is that the records Petitioner relies on to show other documented suicide attempts were not presented to the OCCA at the time it adjudicated his Original Application for Post-Conviction Relief. Review under AEDPA is limited to the record that was before the state court. *Pinholster*, 563 U.S. at 181-182; *Hooks*, 689 F.3d at 1163. In light of the evidence that was presented to the OCCA when it

adjudicated this claim, its conclusion that the June 2004 suicide attempt was the only documented attempt is not unreasonable.

Petitioner next challenges the OCCA's conclusion that trial counsel had a strategic reason for not presenting additional evidence of headbanging. The OCCA explained that trial counsel could reasonably decline to emphasize Petitioner's history of headbanging because, like the suicide attempt, it could also be characterized as not a serious attempt at self-harm. *Tryon*, PCD-15-378 at 12. Although Petitioner proposes that trial counsel should have presented additional instances of his headbanging, trial counsel's decision to present this evidence through expert testimony is not outside the "wide range of reasonable professional assistance" required by *Strickland*. 466 U.S. at 689. As the OCCA explained, this is particularly true in light of the prosecutor's attack on the credibility of Petitioner's other attempt at self-harm. Accordingly, the OCCA's conclusion that trial counsel did not perform deficiently under *Strickland* by failing to introduce additional evidence of suicide attempts or headbanging is neither legally nor factually unreasonable.

Petitioner next raises a series of challenges to the OCCA's conclusion that he failed to show prejudice based on trial counsel's failure to present additional testimony from three witnesses concerning vehicle accidents that resulted in head trauma. He asserts that the OCCA unreasonably concluded that Ronequa Murphy, a witness to one of the accidents, did not describe any adverse mental or physical effects in Petitioner following the accident and did not mention Petitioner being treated at the hospital. These conclusions, according to Petitioner, reflect the "OCCA's unfamiliarity with TBI [traumatic brain injury]." Petition

at 38. Petitioner does not, however, present any information showing that the OCCA's summary of Ms. Murphy's statements is inaccurate.

He then argues that the OCCA's description of the additional evidence presented on post-conviction as cumulative is unreasonable. At trial, the jury heard testimony about the accidents from Petitioner's mother, Petitioner's cousin, Dr. Fabian, and Dr. Musick. Trial Tr. vol. VII, 1594, 1674-1675; vol. VIII, 1835, 2006. Although the additional evidence contains more details about the accidents and Petitioner's injuries, it was hardly unreasonable for the OCCA to characterize this evidence as "cumulative in many ways to [Petitioner's mother's] testimony" given that both sets of evidence identify the accidents as possible sources of traumatic head injuries. *Tryon*, PCD-15-378 at 14.

Finally, Petitioner argues that the OCCA unreasonably applied *Strickland* because it failed to consider the totality of the mitigating evidence in concluding that there was no prejudice. *Strickland*, of course, instructs that a court making a prejudice determination must "consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Unsurprisingly, the OCCA devotes much of its analysis to discussing the evidence contained in the three affidavits that were presented to it on post-conviction review. This fact alone, however, does not establish that the OCCA simply ignored the totality of the evidence in reaching its conclusion. Further, the OCCA specifically mentions at least some of the other mitigating evidence that was presented at trial. *Tryon*, PCD-15-15-378 at 14-15. In any event, considering the additional evidence presented and the evidence presented at trial, Petitioner has not shown that no fairminded jurist could agree with the OCCA's conclusion.

Accordingly, Petitioner's claim that counsel performed ineffectively by failing to investigate and present additional information related to head injuries was reasonably rejected by the OCCA. Relief is denied as to this claim.

### 4. Failure to Obtain Neuroimaging of Tryon's Brain

Petitioner's final subclaim within Ground One argues that appellate counsel was ineffective in not raising a claim based on trial counsel's failure to request funds for neuroimaging (a brain scan). The OCCA rejected this claim on post-conviction because "Petitioner fail[ed] to present any evidence showing us what such a brain scan would have shown…". *Tryon*, PCD-15-378 at 15. Petitioner's post-conviction application asserted in a footnote that post-conviction counsel's request for funding for a brain scan was denied due to budget cuts. Original Appl. for Post-Conviction Relief at 31. The OCCA, Petitioner now contends, unreasonably faulted him for failing to show that for which he was denied funding. Petition at 42. Petitioner claims the OCCA's rejection of the claim is contrary to and an unreasonable application of both *Strickland* and *Ake v. Oklahoma*, 470 U.S. 68 (1985).[10]

*Strickland* instructs that to succeed on an ineffectiveness claim the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. **Thus, the**

---

[10] In his successive application for post-conviction relief, Petitioner asserted that post-conviction counsel was ineffective for failing to provide the brain scan evidence. In its opinion denying relief, the OCCA held that post-conviction counsel was not ineffective because the omitted evidence would not have impacted the jury's sentencing decision. *Tryon*, PCD-2020-231, slip op. at 17-21.

burden is on the defendant to show prejudice and "mere speculation is not sufficient to satisfy this burden." *Byrd*, 645 F.3d at 1168. The OCCA's rejection of the ineffectiveness on the grounds that Petitioner could not establish prejudice because he failed to present evidence of what the brain scan would show is therefore not inconsistent with *Strickland*.

As for *Ake*, it instructs that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist." *Ake*, 470 U.S. at 83. *Ake* further held that a psychiatric expert must be provided during a capital sentencing proceeding "when the State presents psychiatric evidence of the defendant's future dangerousness." *Id.* Petitioner does not explain how the OCCA's rejection of his ineffectiveness claim runs afoul of *Ake*. In any event, *Ake* is not implicated here because trial counsel was not denied funding by the court and the State did not rely on psychiatric evidence to establish Petitioner's future dangerousness.

Petitioner is unable to show that there is no room for fairminded disagreement as to the reasonableness of the OCCA's adjudication of this claim. Petitioner is not entitled to relief.

### B. Ground Two: Failure to Present Evidence of Fetal Alcohol Syndrome

In his second ground for relief, Petitioner argues that his trial and appellate counsel performed deficiently by failing to investigate and present evidence that he suffers from Fetal Alcohol Spectrum Disorder. This claim was not presented to the OCCA until Petitioner's second application for post-conviction relief. The OCCA held that this claim was procedurally barred from review pursuant to Okla Stat. tit 22, § 1089(D) because it

could have been raised in his original application. As explained previously, this claim is procedurally barred and Petitioner has not presented adequate grounds to excuse the default.

### C. Ground Three: Limitations on Mitigation Evidence

Petitioner contends his Eighth and Fourteenth Amendment rights were violated by the trial court's exclusion of certain hearsay statements during the penalty stage of the trial. As part of his mitigation case, Petitioner presented Dr. Musick as an expert witness. Dr. Musick provided lengthy testimony regarding social factors that impacted Petitioner's development, including substance abuse, domestic violence, frequent moves, gang involvement, head injuries, juvenile incarceration, and suicide attempts. In responding to a question posed by defense counsel about whether Petitioner had a violent demeanor as a young child, Dr. Musick conveyed statements told to him by Petitioner's mother regarding Petitioner's father's violent actions. Trial Tr. vol. VIII, 1829. The trial court sustained the prosecutor's hearsay objection and admonished defense counsel that the witness "cannot testify to what other people told him." *Id.* at 1829-1830.

On direct appeal, the OCCA held that the trial court's ruling did not deprive Petitioner of his Eighth Amendment right to present relevant mitigating evidence and there was no plain error affecting Petitioner's substantial rights. *Tryon*, 423 P.3d at 645.[11]

---

[11] In attempting to overcome AEDPA, Petitioner argues that the OCCA unreasonably ignored the Fourteenth Amendment portion of this claim in its adjudication. There are two problems with this argument. First, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits…". *Johnson*, 568 U.S. at 301. The OCCA expressly acknowledged that Petitioner was asserting that the trial court's ruling "deprived him of

Applying AEDPA's deferential standard, the Court concludes that the OCCA's decision was reasonable.

### 1. Clearly Established Law

In a capital trial, "the Eighth and Fourteenth Amendments require that the sentencer…not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original). Under this standard, the Supreme Court has forbidden state courts from using mechanistic applications of state evidentiary rules to exclude mitigating evidence. *See Green v. Georgia*, 442 U.S. 95, 97 (1979); *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973).

Although state evidentiary rules are still in force during the sentencing phase of a capital trial, "due process may sometimes command the relaxation of state evidentiary rules that exclude highly probative evidence and render the trial fundamentally unfair." *Banks*, 692 F.3d at 1143. However, Supreme Court precedent does not require the admission of "any and all mitigation evidence proffered by a capital defendant." *Sallahdin v. Gibson*, 275 F.3d 1211, 1237 (10th Cir. 2002). Rather, the "proffered mitigation evidence must be

---

due process." *Tryon*, 423 P.3d at 644. The fact that the OCCA did not make an explicit due process finding at the conclusion of their analysis does not overcome the presumption that the state court adjudicated the claim on the merits. Second, the OCCA evaluated the claim for plain error, which is akin to the federal due process test. *See Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005) ("We see no practical distinction between the formulations of plain error in [Oklahoma case law] and the federal due-process test…"). Accordingly, AEDPA applies to all aspects of this claim and the Court must defer to the OCCA's ruling unless it was unreasonable. *Id.*

reliable and relevant to be admitted." *Id.* "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)).

### 2. Analysis

Petitioner challenges the OCCA's decision as contrary to and an unreasonable application of *Lockett*, *Green*, and *Chambers*. In *Lockett*, 438 U.S. at 607-608, the Supreme Court invalidated a state sentencing statute that limited the mitigating factors which may be considered by the sentencer. In *Green,* 442 U.S. at 96-97, the Supreme Court ruled that the defendant's due process rights were violated by the exclusion of a hearsay statement that incriminated another person in the murder. Finally, in *Chambers,* 410 U.S. at 302, the Supreme Court held that the defendant's due process rights were violated by the exclusion of hearsay statements and by the denial of the right to cross-examine a specific witness. Notably, the *Chambers* court explicitly stated that it was not establishing a new principle of constitutional law and its holding was confined to the facts of the case. *Id.* Unlike *Lockett*, *Green,* and *Chambers*, where the defendant was prevented from introducing any aspect of the proffered mitigation evidence, Petitioner was not prevented from introducing evidence of his father's violent behavior. While the trial court's hearsay ruling prevented Dr. Musik from regurgitating statements made by Petitioner's mother, it did not prevent Petitioner from introducing extensive testimony on the subject of Petitioner's father's violence, including first-hand accounts from Petitioner's mother, father, and other relatives.

In *Grant v. Royal*, 886 F.3d 874, 959 (2018),[12] the Tenth Circuit recognized that a reasonable jurist could find that the exclusion of cumulative mitigation testimony, like that at issue here, does not run afoul of *Lockett*:

> …we conclude that no reasonable jurists could debate that the OCCA's decision to exclude the other expert reports was not contrary to or an unreasonable application of *Lockett*. More specifically, the OCCA could have reasonably determined that the evil that *Lockett* addressed was not present here. The other expert reports concern Mr. Grant's mental illness and Mr. Grant was never prevented from presenting evidence of his mental illness as a mitigating factor. The record is replete with evidence of Mr. Grant's mental illness, including Dr. Grundy's testimony that Mr. Grant had schizophrenia. Rather, by excluding the other expert reports, the court prevented Mr. Grant from submitting evidence of *additional* examples and proof of Mr. Grant's mental illness. The OCCA could have reasonably determined that such an exclusion is not a concern of *Lockett*— *viz*., the OCCA could have reasonably concluded that *Lockett* does not stand for the proposition that every scrap or scintilla of evidence bearing on a defendant's mitigation issue—here, mental illness—must be admitted without consideration of the rules of evidence.

*Id.* (emphasis in original). Here, like in *Grant*, the Petitioner was never prevented from presenting evidence of his father's violent behavior as a mitigating factor. The trial court's exclusion of the hearsay statements at issue simply prevented an expert from restating testimony that was previously conveyed by other witnesses. The OCCA could reasonably conclude that "such an exclusion is not a concern of *Lockett*" and its progeny.

In addition to challenging the legal reasonableness of the OCCA's decision, Petitioner also asserts that the OCCA made four unreasonable factual determinations: 1) trial counsel waived a constitutional challenge; 2) the trial court's ruling was based on

---

[12] This portion of the Tenth Circuit's opinion in *Grant* was specifically addressing whether the petitioner was entitled to a Certificate of Appeal on this issue. 886 F.3d at 957.

Okla. Stat. tit. 12, § 2703 and § 2705;[13] 3) the trial court's ruling was "driven by the compelling state interest of preventing a party from using an expert witness as a mere conduit to regurgitate large amounts of inadmissible and possibly unreliable hearsay"; and 4) the trial judge had the discretion to sustain the objection on the grounds the expert's evidence was cumulative. Petition at 66. All of these conclusions are supported by the record and Petitioner fails to explain how any are unreasonable.[14] Further, other than the OCCA's conclusion that it "was well within the trial court's discretion" "to disallow cumulative accounts by the expert witness," the OCCA's denial of relief was not based on the conclusions Petitioner claims are unreasonable. *See Byrd,* 645 F.3d at 1172 (explaining that under § 2254(d)(2), relief is only permitted where the state court's decision is "based on" the unreasonable factual determination.").

---

[13] Section 2703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Section 2705 provides:

> An expert may testify in terms of opinion or inference and give reasons therefor without previous disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

[14] As Respondent points out, some of Petitioner's alleged factual findings are actually legal conclusions. Brief for Respondent at 39-40. In any event, under either 28 U.S.C. § 2254(a)(1) or (a)(2), Petitioner's claim fails.

The OCCA reasonably concluded the trial court's limitation on Dr. Musik's testimony did not violate Petitioner's right to present mitigating evidence under the Eighth or Fourteenth Amendments. Accordingly, Petitioner is not entitled to relief.

### D. Ground Four: Failure to Instruct on Intoxication and Second Degree Murder

In his fourth ground for relief, Petitioner argues that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by the trial court's refusal to issue jury instructions on Intoxication and Second Degree Murder and that appellate and trial counsel provided ineffective assistance by failing to present additional evidence in support of these instructions. On direct appeal, the OCCA held that there was insufficient evidence presented to support an instruction for Intoxication or Second Degree Murder. *Tryon*, 423 P.3d at 638-640. On post-conviction, the OCCA further held that Petitioner failed to show either deficient performance or prejudice based on appellate counsel's failure to pursue a "meritless claim" concerning trial counsel's failure to present additional evidence of intoxication. *Tryon*, PCD-2015-378, slip op. at 5. The OCCA's findings are reasonable.

#### 1. Intoxication Instruction

##### a. Clearly Established Law

The Supreme Court has not recognized a free-standing constitutional right to an intoxication instruction.[15] *Spears v. Mullin*, 343 F.3d 1215, 1244 (10th Cir. 2003). That

---

[15] Petitioner cites *Mathews v. United States*, 485 U.S. 58 (1988) as the clearly established federal law that controls this claim. *Mathews* held that "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Id.* at 63. However, as explained by the Tenth Circuit, the decision in *Mathews* "was not based on the Constitution

narrows this Court's review to the question of whether the trial, viewed in the context of the entire proceeding, ran afoul of fundamental fairness and due process. *Id*. In this specific context, where the court refused to give a certain instruction, Petitioner's burden is "especially great because [a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Tyler v. Nelson*, 163 F.3d 1222, 1227 (10th Cir. 1999) (quoting *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) (internal quotation marks omitted)).

Oklahoma allows juries to consider voluntary intoxication as a defense when there is sufficient evidence to establish a prima facie case that the defendant was so "utterly intoxicated, that his mental powers [were] overcome, rendering it impossible for [the] defendant to form the specific criminal intent . . .." *Spears*, 343 F.3d at 1244 (quoting *Toles v. Gibson*, 269 F.3d 1167, 1177 (10th Cir. 2001)); *Malone v. Oklahoma*, 168 P.3d 185, 197 n.48 (Okla. Crim. App. 2007). If a trial court determines that the evidence is insufficient to make that showing, it can refuse to give the instruction. *Fitzgerald v. Oklahoma*, 972 P.2d 1157, 1174 (Okla. Crim. App. 1998).

### b. Analysis

At trial, Petitioner's cousin, Eric Wilson, testified that he saw Petitioner consume alcohol, cocaine, and PCP on each of the three days preceding the murder. Trial Tr. vol. IV at 1056-1063. He further testified that on March 15th, the day before the murder,

---

or federal habeas corpus principles." *Jackson v. Mullin*, 46 F. App'x 605, 609, fn. 1 (10th Cir. 2002) (unpublished). Accordingly, the holding in *Mathews* does not provide the clearly established federal law that controls this case. *Id.*

Petitioner started getting high around 10:00 a.m. and consumed two vials of PCP over the course of five hours. *Id.* at 1060-1061. Petitioner also consumed cocaine and started drinking alcohol at around 9:00 p.m. *Id.* at 1061-1063. Eric Wilson testified that Petitioner continued to snort cocaine and drink alcohol into the early morning hours of March 16th.[16] *Id.* at 1064-1065.

Several of Petitioner's family members also testified regarding Petitioner's demeanor when he is high on PCP. Eric Wilson explained that when Petitioner is high on PCP he "looks like he's slow" and will be "drooling" and "talking gibberish." *Id.* at 1056. Rico Wilson, Petitioner's brother, similarly testified that Petitioner "wouldn't be all belligerent or acting all out" but would instead just "be to hisself" and "couldn't even speak a full sentence thoroughly." *Id.* at vol. IV, 1003. Petitioner's father described Petitioner as being "zombielike, spaced-out, not knowing where he was or who he was" when high on PCP. *Id.* at 1031-1032.

In finding that a voluntary intoxication instruction was not warranted, the OCCA relied on Petitioner's ability to provide a "detailed, lucid account of what happened" and the fact that "his behavior and interaction with the police after being arrested does not suggest intoxication of any kind." *Tryon,* 423 P.3d at 640. Indeed, Petitioner had the mental

---

[16] Petitioner takes issue with the OCCA's conclusion that "at best [Petitioner] used drugs and drank gin in the hours leading up to the killing" and argues that he was more accurately on a multi-day binge. *Tryon*, 423 P.3d at 640. However, there is nothing inaccurate about the OCCA's statement. Further, the OCCA's ruling was not based on the number of days or hours Petitioner consumed drugs, but on the lack of evidence in support of an intoxication instruction.

faculties to provide a thorough recounting of the event[17] and law enforcement officers who interacted with Petitioner testified that he was acclimated to time and place and did not appear to be intoxicated. Trial Tr. vol. III, 692-693; 870-872; State's Ex. 58. The Tenth Circuit has repeatedly relied on this type of evidence in rejecting similar challenges to the reasonableness of the OCCA's decision. *See Bland v Sirmons*, 459 F.3d 999, 1031 (10th Cir. 2006) (OCCA's decision that defendant's detailed recollection of the murder precluded a voluntary intoxication instruction was not unreasonable); *Spears*, 343 F.3d at 1245 (defendant's statement detailing the murder belies voluntary intoxication claim); *Valdez v. Ward*, 219 F.3d 1222, 1245 (10th Cir. 2000) (defendant's description of the evening's events in explicit detail undermined the necessity of voluntary intoxication instruction). Petitioner's intoxication claim is further undermined by the fact that the act of violently stabbing someone and then providing a coherent statement to police is wholly inconsistent with his relatives' descriptions of his demeanor when high on PCP.

Although Petitioner produced evidence that he consumed alcohol and drugs prior to the crime, no evidence established that he was so "utterly intoxicated" at the time of the murder that he could not form specific criminal intent. *See Spears*, 343 F.3d at 1245. At the very least, it was not unreasonable for the OCCA to reach this conclusion given

---

[17] Petitioner argues that it was unreasonable for the OCCA to rely on Petitioner's confession because Oklahoma case law distinguishes between a defendant's lucidity in regards to alcohol intoxication and his lucidity in regards to other substances. Of course, on habeas review, the Court is concerned with whether there has been an unreasonable application of federal law, not whether Oklahoma misconstrued its own precedent. *Grant*, 886 F.3d at 947, fn. 25. In any event, the Court disagrees with Petitioner's interpretation of Oklahoma case law on this issue.

Petitioner's detailed confession and behavior following the murder. Viewing the trial in context, this Court cannot say that the omission of the voluntary intoxication instruction resulted in a fundamentally unfair trial.

### 2. Second Degree Murder Instruction

### a. Clearly Established Law

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court addressed the necessity of lesser-included instructions for capital crimes:

> …when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense–but leaves some doubt with respect to an element that would justify conviction of a capital offense–the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

> Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments . . . .

*Id*. at 637. *Beck*, therefore, held that the Due Process Clause "sometimes requires a state charging a defendant with a capital offense to permit the jury to consider alternative, lesser included offenses that do not carry with them the prospect of a death sentence." *Grant*, 727 F.3d at 1011 (citing *Beck*, 447 U.S. at 627). To prevail on a claim under *Beck*, a defendant "must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first-degree murder." *Young v. Sirmons*, 486 F.3d 655, 670 (10th Cir. 2007).

### b.  Analysis

Petitioner contends the trial court violated *Beck* by failing to give the jury the option of finding him guilty of the lesser included – and noncapital – offense of second degree murder. Second degree depraved mind murder under Oklahoma law is committed "[w]hen [a homicide is] perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." Okla. Stat. tit. 21, § 701.8(1).

The OCCA rejected Petitioner's *Beck* claim, finding that "[t]he record fails to contain any evidence showing [Petitioner] acted without any premeditated design to effect death." *Tryon*, 423 P.3d at 638. In analyzing Petitioner's *Beck* claim, the OCCA found that:

> Appellant stabbed the victim seven (7) times in the head, neck, back, torso and hand. Numerous superficial cuts too were observed on the victim's head and neck and were consistent with having been made by a serrated blade.
>
> In his videotaped interview, Appellant admitted grabbing the victim, holding on to her and stabbing her repeatedly. Appellant was separated from the victim only when a security guard sprayed him in the face with pepper spray. Appellant said that he brought the kitchen knife from home so that if he saw Tia, he could stab her. Appellant said too that he and Tia had been arguing about his support of their child and that the relationship between them recently ended. Appellant admitted being angry and depressed when he stabbed the victim. 'Nothing in these facts suggests anything but a design to effect the death of one specific person.' All things considered, there was insufficient evidence presented to allow a jury rationally to find the accused guilty of second degree depraved mind murder and acquit him of first degree malice aforethought murder.

*Id*. (internal citations omitted).

Petitioner contends the OCCA erred in concluding there was no evidence to support a second degree murder instruction.[18] Specifically, he asserts that evidence related to the loss of a relationship with his girlfriend and child, fetal alcohol syndrome, clinical depression, drug use, and his alleged blackout suggests that he acted with a depraved mind and never meant to kill the victim. Petition at 71-72. Interpreting Petitioner's arguments generously, his theory in support of second degree murder appears to be that he was depressed, intoxicated, and upset, and only went to the bus station intending to speak to the victim. Petition at 72-72; Brief for Appellant at 50.

None of Petitioner's assertions render unreasonable the OCCA's finding that the record fails to contain evidence that Petitioner acted without any premeditated design to effect death. Petitioner does not explain how his depression, fetal alcohol syndrome, or drug use could lead a rational juror to conclude that he acted without intent and he offered no expert testimony showing that he suffered mental infirmities that rendered him unlikely

---

[18] Petitioner does not explicitly argue that the OCCA applied an incorrect legal standard, but he does suggest that the OCCA "unreasonably weighed the evidence" and cites to a series of cases where the Tenth Circuit ruled that the OCCA applied a standard that contradicts *Beck*. Petition at 71-73. In *Phillips v. Workman*, 604 F.3d 1202 (10th Cir. 2010), *Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009), and *Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999), the Tenth Circuit held that the OCCA's *Beck* claim analysis was not entitled to deference under AEDPA because it focused on the sufficiency of the evidence to support the capital offense, rather than the sufficiency of the evidence to support the lesser-included offense, and therefore engaged in the wrong inquiry. Here, the OCCA recognized the proper *Beck* standard and engaged in the correct inquiry by addressing whether Petitioner presented sufficient evidence to support a second degree murder instruction. The OCCA's decision indicates the instruction was not warranted because Petitioner did not have sufficient evidence showing he acted without any premeditated design to effect the death of a specific person, which is an essential element for second degree murder. *Tryon,* 423 P.3d at 638.

or unable to form the intent to kill. *See Young*, 486 F.3d at 674 (rejecting lesser included offense instruction where, *inter alia*, no expert testified defendant was unable to form an intent to kill). Further, even assuming this evidence would help establish that Petitioner was emotionally disturbed or acting with a depraved mind, it does not show that he acted without any premeditated design to cause the death of another person. As for Petitioner's assertion that he blacked out, this is belied by his other statements, where he recounted the events of the murder in detail.

The OCCA found that Petitioner stabbed the victim multiple times in the head, neck, back, torso and hand, and that he brought the knife with him so that if he saw the victim, he could stab her.[19] *Tryon*, 423 P.3d at 638. These facts are similar to *Grant v. Trammell*, 727 F.3d at 1014-1015, where the Tenth Circuit affirmed the OCCA's rejection of the defendant's *Beck* claim. In *Grant*, the defendant was a prisoner who, after previously threatening the victim, forced her into a closet and then repeatedly stabbed her in the vital organs. *Id.* at 1014. The defendant argued he was entitled to a second degree murder instruction because he was dazed and highly agitated when he committed the murder and couldn't remember the incident. *Id.* The Tenth Circuit concluded that "[n]one of these facts, however, clearly and convincingly unseats the OCCA's finding that all of the evidence

---

[19] Petitioner claims this is an unreasonable factual finding because he never made this statement. During his taped interview with police shortly after the crime, Petitioner answered in the affirmative when the detective asked if he took the knife with him because he knew this was going to happened. Petitioner then stated "I knew she went to go handle some business today, but I didn't know for sure I was going to see her. But, I had it with me, just in case I did see her." *See* State's Ex. 58. Given Petitioner's statements, the OCCA's factual finding is clearly supported by the record.

surrounding the killing suggested a degree of premeditation." *Id.* They further concluded that even under *de novo* review, a rational jury presented with the facts in the record could not have found that the defendant "acted 'without *any* premeditated design[]' to kill [the victim]." *Id.* at 1015 (emphasis in original).

Here, Petitioner was upset with the victim, brought a knife to a location where he thought he might see the victim, and then stabbed her multiple times. Under similar facts, the *Grant* court found that the defendant's claim that he could not remember the murder and was dazed and agitated was insufficient to warrant a second degree murder instruction. Likewise, Petitioner's claim that he blacked out or was suffering from certain mental infirmities does not undermine to the point of unreasonableness the OCCA's finding that the record fails to contain evidence showing Petitioner acted without any premeditation.

Further, this case is distinguishable from other cases where the Tenth Circuit has found *Beck* error. In *Phillips,* 604 F.3d at 1205, the defendant approached a group of strangers outside of a gas station and inexplicably stabbed one of the individuals a single time. The Tenth Circuit held a second degree murder instruction was warranted because the facts showed that the defendant may have been severely emotionally disturbed and raised doubts as to whether he had the requisite mental state for first degree murder. Similarly, in *Taylor,* 554 F.3d at 890-891, the Tenth Circuit ordered a second degree murder instruction where the defendant did not know the victim, there was no direct evidence regarding the defendant's state of mind towards the victim, and the defendant testified that he did not aim the gun as he shot the victim. Finally, in *Hogan*, 197 F.3d at 1308-1309, the Tenth Circuit held that a manslaughter instruction was appropriate where

48

there was evidence that the victim initially attacked the defendant with a knife, the defendant believed the victim was running to retrieve another knife when he began to stab her numerous times, the defendant was visiting the victim at her request, and there was no evidence of any prior arguments.

Unlike in *Phillips* and *Taylor*, the murder in this case was not perpetrated against a random stranger who happened to be in the wrong place at the wrong time. Petitioner had a prior relationship with the victim and his statements to police indicate that he brought the knife with him in case he saw the victim. Additionally, unlike in *Hogan,* there was no evidence of any threatening actions by the victim that would raise doubts as to whether Petitioner was acting with premeditation or merely reacting to the victim's attack.

"Under Oklahoma law, a second degree murder conviction is permissible only when the defendant acts 'without any premeditated design to effect the death of any particular individual.'" *Grant*, 727 f.3d at 1014. It was reasonable for the OCCA to conclude that Petitioner's alleged evidence in support of second degree murder – depression, drug use, FASD, emotional distress as a result of the breakup, blackout – was insufficient to allow a rational jury to find the Petitioner acted without any premeditation.

### 3. Investigation and Presentation of Intoxication Defense

Petitioner additionally contends appellate counsel performed deficiently by failing to raise a claim based on trial counsel's failure to adequately investigate and present an intoxication defense. As previously explained, claims of ineffective assistance of counsel are governed by the two-part test articulated in *Strickland*.

The OCCA, after addressing the underlying trial counsel ineffectiveness claims, held that "Petitioner fail[ed] to show deficient performance or prejudice under *Strickland* based on appellate counsel's failure to pursue this meritless claim." *Tryon*, PCD-2015-378, slip op. at 5. Because the OCCA adjudicated Petitioner's ineffectiveness claim on the merits, this Court is precluded from granting relief unless the decision was based on an unreasonable factual determination or reached a legal conclusion that was contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. §2254(d). Yet Petitioner devotes the majority of his argument on this subclaim to summarizing post-conviction counsel's brief and explaining how trial counsel could have presented an intoxication defense rather than to identifying how the OCCA's decision is legally or factually unreasonable.

In any event, from what the Court can discern, Petitioner's argument appears to be that the OCCA made unreasonable determinations when analyzing Petitioner's intoxication and second degree murder instruction claims, and these led to the OCCA unreasonably concluding that trial counsel was not ineffective. However, as explained in the preceding sections, the OCCA's determinations as to those subclaims were reasonable. Further, the OCCA's conclusion that Petitioner failed to show either deficient performance or prejudice under *Strickland* was reasonable.

On post-conviction, Petitioner presented statements from several eyewitnesses and referenced two resources – the DSM-5 and a drug evaluation and classification training

manual – which he claims could have been used to bolster his intoxication defense.[20] But, as the OCCA found, much of what is contained in the witness statements and cited resources is cumulative to other testimony related to Petitioner's drug use. Moreover, it was within the bounds of reasonable professional judgment for trial counsel to decline to call a litany of eyewitnesses to the stand. While these witnesses perhaps could have provided some testimony indicating that Petitioner was under the influence of drugs, their testimony would have also exposed the jury to numerous accounts of the murder while adding little to his claim that he was too intoxicated to form the requisite intent. The eyewitness accounts, which describe Petitioner as having a "look of rage in his eyes" and requiring multiple people to pull Petitioner off the victim, *see* Attach. 38-42, also contradict the descriptions of Petitioner's stupor-like demeanor when he is high on PCP that were given by his family members, which further reinforces that trial counsel made a reasoned strategic decision to not present these witnesses. *See Strickland*, 466 U.S. at 690 ("…strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable…").

Even assuming trial counsel performed deficiently in failing to present additional evidence of Petitioner's intoxication or rebut testimony regarding the effects of PCP, it was

---

[20] In a footnote, Petitioner also argues that it was unreasonable for the OCCA to omit any references to one of these training resources, the DSM-5, and to describe the Petitioner's police interview as occurring "shortly after the murder." However, "AEDPA does not empower federal courts to 'impose mandatory opinion-writing standards on state courts.'" *Wood v. Carpenter*, 907 F.3d 1279, 1303 (10th Cir. 2018) (quoting *Johnson*, 568 U.S. at 300. Further, the interview occurred approximately three hours after the incident, which hardly makes the OCCA's description of the time frame unreasonable.

reasonable for OCCA to conclude he was not prejudiced by trial counsel's decision. Petitioner's additional evidence is hardly compelling proof of utter intoxication, particularly in light of the fact that Petitioner was able to make his way to the bus station, hold on to the victim while repeatedly stabbing her, provide a detailed confession regarding the crime, and interact with numerous law enforcement officers, none of whom observed anything suggesting he was intoxicated. The OCCA's conclusion that Petitioner failed to show either deficient performance or prejudice under *Strickland* is reasonable.

### 4. Conclusion

AEDPA "requires federal courts to give significant deference to state court decisions." *Lockett*, 711 F.3d at 1230. When a state court has adjudicated a habeas petitioner's claims on the merits, the federal court "may reverse only if all 'fairminded jurists' would agree that the state court got it wrong." *Id.* (quoting *Harrington*, 562 U.S. at 103). Petitioner cannot meet this standard. The OCCA reasonably concluded that neither a voluntary intoxication instruction nor a second degree murder instruction was warranted and that counsel was not ineffective in its presentation of the intoxication defense. Petitioner is not entitled to relief.

### E. Ground Five: Failure to Rebut Continuing Threat Evidence

Petitioner's fifth ground for relief asserts that appellate counsel performed deficiently by not raising a claim based on trial counsel's failure to adequately rebut evidence related to the continuing threat aggravator. He specifically complains of trial counsel's response to evidence that Petitioner was involved in two separate jail fights, one occurring in 2009 and one occurring in 2013.

### 1. The 2009 Jail Fight

During the mitigation stage, the State presented testimony from a jail detention officer who observed a fight between Petitioner and another inmate in 2009. Trial Tr. vol. VI, 1274-1275. The officer testified that he did not know who started the fight and that both inmates complied when he and other guards arrived. *Id.* at 1276-1277. Petitioner asserts that trial counsel performed deficiently by failing to investigate and present information from a jail disciplinary report showing that Petitioner was merely defending himself. He argues that trial counsel had adequately prepared, she could have succeeded in excluding evidence of the fight, or at least prevented the prosecution from presenting an incomplete picture of what happened.

The OCCA rejected this claim for two separate reasons. First, the OCCA found that Petitioner failed to carry his burden of proving ineffectiveness because the jail misconduct report was hearsay and he did not come forward with affidavits from any witness explaining the findings.[21] *Tryon*, PCD-2015-378, slip op. at 9-10. Second, the OCCA found that trial counsel's failures did not result in prejudice because the State presented "strong evidence showing Petitioner's recurring violence in a variety of contexts." *Id.* at 10. Petitioner challenges both rationales as unreasonable. However, it is unnecessary for the Court to analyze the OCCA's hearsay rationale because alternative rationale "passes

---

[21] In its Opinion Denying Second Application for Post-Conviction Relief, Tryon, PCD-2020-231, slip op. at 22-24, the OCCA held that post-conviction counsel was not ineffective for failing to include the affidavit because "[e]ven considering the full contents of [the witness'] proposed testimony, Petitioner fails to show *Strickland* prejudice for largely the same reasons cited by this Court in our original post-conviction opinion."

muster under the AEDPA standards." *Gilson v. Sirmons*, 520 F.3d 1196, 1237 (10th Cir. 2008) (denying habeas relief where one of the OCCA's three stated rationales was reasonable).

*Strickland*, which supplies the clearly established law for ineffectiveness claims, provides that a court making a prejudice inquiry "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Petitioner argues that the OCCA failed to comply with this standard because it relied only on the aggravating evidence to find no prejudice and "failed to mention or consider" the totality of the evidence. Petition at 80. True, the OCCA did reference the additional aggravating evidence in its analysis of this subclaim and the decision does not use the phrase "totality of the evidence," but this is not enough to render their decision unreasonable. The "OCCA's decision is entitled to deferential review even when it fails to discuss all of the evidence." *Harmon v. Sharp*, 936 F.3d 1044, 1073 (10th Cir. 2019). Further, the "focus under AEDPA's deferential standard is on the reasonableness of a state court's decision…not on the unalloyed rectitude of each line of text of a state court's opinion." *Grant*, 886 F.3d 874, 919 (10th Cir. 2018). The habeas court must operate under the "presumption that state courts know and follow the law" and give state court decisions "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). With these standards in mind, the Court is persuaded that the OCCA's overall analysis reflects that it resolved Petitioner's claim using the proper prejudice inquiry and that it reached a reasonable conclusion.

As the OCCA recognized, "the State presented strong evidence supporting the continuing threat aggravator beyond evidence concerning jailhouse fights." *Tryon,* PCD-

2015-378, slip op. at 10. This evidence included testimony showing Petitioner's involvement in gangs and participation in several violent encounters. Although evidence of jail fights may be particularly indicative of future dangerousness, this is not the only type of incident that can support the continuing threat aggravator. *See Harris v. Sharp*, 941 F.3d 962, 1009 (10th Cir. 2019); *Grant*, 727 F.3d at 1017. Petitioner presented significant mitigation evidence regarding his background and mental health, but given the strength of the State's evidence, a fairminded jurist could conclude that there is no reasonable probability that the jury would have reached a different result even if trial counsel successfully excluded or rebutted evidence of the 2009 jail fight.

### 2. The 2013 Jail Fight

In addition to the 2009 jail fight, the jury also saw a video recording of a 2013 jail fight between Petitioner and Dartangen Cotton. Trial Tr. vol. VI, 1329-1331. Mr. Cotton was also charged with a capital offense and happened to be represented by two of Petitioner's same trial attorneys. *Id.* at 1326; Mot. For Continuance Hr'g at 3-4, July 10, 2014. Petitioner argues that the representation of Petitioner and Mr. Cotton by the same attorneys was an actual conflict of interest and appellate counsel was ineffective in failing to raise this issue on direct appeal.

This claim was not presented to the OCCA until Petitioner's second application for Post-Conviction Relief. The OCCA denied the claim as procedurally barred. As explained in Ground One, the procedural bar prevents this Court from reviewing the defaulted claim.

### 3. Conclusion

The OCCA's resolution of the Petitioner's ineffectiveness claim based on the 2009 jail fight is reasonable. The claim based on the 2013 jail fight is procedurally barred. Petitioner is not entitled to relief.

## F. Ground Six: Form and Application of Heinous, Atrocious, or Cruel Aggravator

Petitioner's sixth ground for relief raises an Eighth and Fourteenth Amendment challenge to the heinous, atrocious, or cruel (HAC) aggravator. Petitioner contends that Oklahoma has strayed from its narrow interpretation of the aggravator such that it now applies to almost any murder, rendering the HAC aggravator unconstitutionally vague and overbroad in both form and application. The OCCA rejected Petitioner's vagueness challenge on direct appeal. *Tryon*, 423 P.3d at 652. Petitioner cannot show that the OCCA's decision is unreasonable.

### 1. Clearly Established Law

The Eighth Amendment demands that a sentencer's discretion in a capital case "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). To meet this standard, a State's capital sentencing scheme must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (internal citations omitted). The State "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more

severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

Thus, when a state directs the discretion of the capital sentencer through application of statutory aggravating circumstances, the aggravator must meet two requirements: (1) it "may not apply to every defendant convicted of a murder"; and (2) it "may not be unconstitutionally vague." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). Although vagueness review of aggravating circumstances is "quite deferential," an aggravator must nevertheless have some "common-sense core meaning . . . that criminal juries should be capable of understanding." *Id.* at 973 (internal quotations omitted).

### 2. Analysis

Oklahoma permits the imposition of a death sentence if a jury unanimously finds beyond a reasonable doubt that "the murder was especially heinous, atrocious, or cruel." Okla.Stat.tit. 21, § 701.12(4). In response to *Maynard v. Cartwright*, 486 U.S. 356 (1988), where the Supreme Court invalidated this aggravator as unconstitutionally vague, the OCCA adopted a limiting construction. Under this limiting construction, the HAC aggravator is restricted to murders in which torture or serious physical abuse is present. *See Stouffer v. State*, 742 P.2d 562, 563 (Okla. Crim. App. 1987); *Cheney v. State*, 909 P.2d 74, 80 (Okla. Crim. App. 1995). "Torture" includes the infliction of either great physical anguish or extreme mental cruelty. *Cheney,* 909 P.2d at 80. Conscious physical suffering prior to death is required to support a finding of "serious physical abuse" or "great physical anguish." *Id.* On direct appeal, the OCCA relied on this limiting construction in rejecting

Petitioner's claim that the HAC aggravator is unconstitutionally vague and applied in an overbroad manner. *Tryon*, 423 P.3d at 652.

The Tenth Circuit "has repeatedly held that under this limiting construction, Oklahoma's HAC aggravator is not unconstitutionally vague." *Mitchell v. Sharp*, 798 F. App'x 183, 191 (10th Cir. 2019) (unpublished); *see also Workman v. Mullin*, 342 F.3d 1100, 1115–16 (10th Cir.2003) (collecting cases). This limiting construction has also been cited with approval by the Supreme Court. *See Maynard*, 486 U.S. at 364-65. Faced with this formidable body of precedent, Petitioner argues that Oklahoma has "slowly strayed" from its limiting construction such that the HAC aggravator is now unconstitutionally vague on its face.[22]

The Tenth Circuit recently addressed a nearly identical argument in *Mitchell*, 798 F. App'x at 192-194. There, the petitioner conceded that the OCCA had adopted a constitutionally permissible construction of the HAC aggravator but argued that Oklahoma had "veered off course" and returned to applying an aggravator that was unconstitutionally vague. *Id.* at 192. The Tenth Circuit rejected this argument for two reasons. First, relying on the OCCA's citation to the limiting construction, the Tenth Circuit noted that the petitioner could not show that the OCCA had applied an unconstitutional aggravator in his case. *Id.* at 192-193. Second, the Tenth Circuit held that

> even if there were room for debate as to whether the OCCA applied the constitutional construction, under *Bell v. Cone*, we must presume the state court applied the appropriately narrowed construction unless [petitioner]

---

[22] Respondent argues that Petitioner failed to exhaust his facial challenge to the HAC aggravator. Rather than delve into this procedural issue, the Court elects to exercise its discretion to reject the claim on the merits. 28 U.S.C. § 2254(d); *Hooks,* 689 F.3d at 1179.

makes an affirmative showing to the contrary. *Bell*, 543 U.S. at 456, 125 S.Ct. 847. In *Bell*, the Sixth Circuit determined that the Tennessee Supreme Court failed to apply a constitutional narrowing construction of the state's HAC aggravator. *Id*. at 451-52, 455, 125 S.Ct. 847. The Supreme Court reversed, noting that "[f]ederal courts are not free to presume that a state court did not comply with constitutional dictates." *Id*. at 455, 125 S.Ct. 847. The Court further explained, "[T]he [Tennessee] Supreme Court ... construed the aggravating circumstance narrowly and ... followed that precedent numerous times; absent an affirmative indication to the contrary, we must presume that it did the same thing here." *Id*. at 456, 125 S.Ct. 847.

[Petitioner] cannot overcome this presumption. Like the state courts in *Bell*, the OCCA adopted a constitutionally permissible narrowing of the HAC aggravator and 'followed that precedent numerous times.' *Id*. We therefore presume the OCCA continued to apply its constitutional narrowing construction unless [Petitioner] can provide an "affirmative indication to the contrary." *Id*. He offers no such "affirmative indication." *Id*.

*Id*. at 193. Relying on *Arave v. Creech*, 507 U.S. 463, 477 (1993), where the Supreme Court explained that its "decisions do not authorize review of state court cases to determine whether a limiting construction has been applied consistently," the Tenth Circuit also held that the OCCA's misapplication of the HAC aggravator in other cases would not provide the affirmative indication required for the petitioner to overcome *Bell's* presumption. *Id*. at 194 (quoting *Arave*, 507 U.S. at 477).

The reasoning in *Mitchell* is persuasive and dictates the outcome in this case. In its direct appeal opinion, the OCCA recited its previously approved limiting construction and applied that construction to Petitioner's case. *Tryon*, 423 P.3d at 650-652. Accordingly, there is no room for Petitioner to argue that a vague HAC aggravator was used in his case. Even if this was not plain from the text of the OCCA's opinion, Petitioner still cannot overcome *Bell's* presumption that the OCCA applied the appropriately narrowed construction. *Bell*, 543 U.S. at 456. As the Tenth Circuit found in *Mitchell*, the OCCA's

limiting construction has been repeatedly upheld, the OCCA has applied the limiting construction numerous times, and Petitioner offers no affirmative indication that an unconstitutional construction of the HAC aggravator was used in his case. Accordingly, the OCCA's application of the HAC aggravator, and its rejection of Petitioner's vagueness claim, "was not 'contrary to' or 'an unreasonable application of[ ] clearly established Federal law.' *Mitchell,* 798 F. App'x. at 194 (quoting 28 U.S.C. § 2254(d)).

Additionally, to the extent Petitioner challenges the HAC aggravator as unconstitutionally vague as applied to him, that argument is misplaced. In *Lewis v. Jeffers,* 497 U.S. 764, 779-781 (1990), the Supreme Court explained that "if a State has adopted a constitutionally narrow construction of a facially vague aggravating circumstance, and if the State has applied that construction to the facts of the particular case, then the 'fundamental constitutional requirement' of 'channeling and limiting ... the sentencer's discretion in imposing the death penalty,' has been satisfied," and the only remaining challenge to the application of the aggravator is a sufficiency of the evidence claim. Petitioner raises a sufficiency of the evidence claim in Ground Seven and it is addressed therein.

The OCCA reasonably rejected Petitioner's vagueness challenge. Petitioner is not entitled to relief.

### G. Ground Seven: Evidence of the Heinous, Atrocious, or Cruel Aggravator.

Petitioner challenges the evidence supporting the jury's finding of the heinous, atrocious, or cruel aggravator by arguing that the victim's quick death was not preceded by the conscious physical suffering necessary to support the aggravator. The OCCA addressed

this claim on direct appeal and denied relief. Viewing the claim through AEDPA's highly deferential lens, the Court concludes that the OCCA's decision was not unreasonable.

### 1. Clearly Established Law

Federal courts reviewing whether evidence supports an aggravating circumstance must use the reasonable fact-finder standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Jeffers*, 497 U.S. at 782. This standard requires the court to determine whether, "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found'" the aggravating circumstances beyond a reasonable doubt. *Id.*, 497 U.S. at 782 (quoting *Jackson*, 443 U.S. at 319); *see also Brown v. Sirmons*, 515 F.3d 1072, 1088 (10th Cir. 2008). "Review under this standard is 'sharply limited' and a court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Hamilton v. Mullin*, 436 F.3d 1181, 1194 (10th Cir. 2006) (internal quotation omitted).

When the AEDPA applies, the sufficiency question is a mixed question of law and fact and is thus governed by 28 U.S.C § 2254(d)(1) and (d)(2). *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006). This Court must therefore presume that the OCCA's factual determinations are correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). On the legal question, the court cannot overturn the OCCA's sufficiency determination unless that decision is objectively unreasonable. *Parker v. Matthews*, 567 U.S. 37, 43 (2012). The Supreme Court has described this standard as "twice-deferential." *Id.*

When reviewing the evidentiary sufficiency of an aggravating circumstance under *Jackson*, the Court looks to Oklahoma substantive law to determine its defined application. *Hamilton*, 436 F.3d at 1194. As previously explained, Oklahoma construes the HAC aggravator as requiring proof of extreme mental cruelty or serious physical abuse accompanied by conscious physical suffering. *Pavatt*, 928 F.3d at 917.

### 2. Analysis

In reviewing Petitioner's sufficiency of the evidence claim, the OCCA applied the same standard of review set forth in *Jackson* and concluded that, taking the evidence in the light most favorable to the State, "any rational trier of fact could have found the victim was conscious for a significant portion of the stabbing and that she suffered the requisite torture or serious physical abuse." *Tryon,* 423 P.3d at 650-652. Petitioner challenges this conclusion as factually and legally unreasonable. In reviewing these challenges, it bears repeating that the Court's responsibility is not to determine whether the evidence meets *Jackson's* reasonable fact-finder standard. Rather, the Court must determine whether fairminded jurists could disagree regarding the correctness of the state court's application of *Jackson*. *See Harrington*, 562 U.S. at 101. If there is room for fairminded disagreement, the claim must fail under AEDPA.

Petitioner asserts that the OCCA made unreasonable factual determinations when it concluded that the victim experienced the requisite conscious physical suffering, "actively resisted the stabbing for a significant period of time," and suffered a "defensive wound." *Tryon*, 423 P.3d at 651. He points to testimony from eyewitnesses who stated that the victim was unconscious or dead within seconds, testimony from the medical examiner who

stated that a person with the victim's injury would not be able to breath "for long," and a video recording of the incident showing the rapid time frame of the event. The evidence is not, however, as one-sided as Petitioner portrays it to be.

Petitioner first relies on testimony from eyewitness Deborah Sealy to argue that the victim was dead within seconds and did not struggle. Ms. Sealy did not observe the victim hit or slap the defendant before he started stabbing her and she testified that she "knew the victim was dead" shortly after the stabbing began because she hit a nearby glass door "so hard." Trial Tr., vol. III, 660-662. But she also testified that she heard the victim say "leave me alone" before the stabbing began and heard the victim say "help" after the stabbing started. *Id.*

Petitioner also relies on testimony from Kenneth Burke, a security guard who responded to the scene after the attack began. *Id*. at 632-633. Mr. Burke testified that after he subdued Petitioner, he turned his attention to the victim and did not observe any signs of life from her. *Id*. at 635. Of course, the fact that Mr. Burke did not observe the victim to be struggling by the time he arrived on the scene and restrained Petitioner does not prohibit a rational factfinder from concluding that the victim was conscious or actively resisting prior to that time.

Finally, Dr. Inas Yacoub, the medical examiner, testified that the victim had seven stab wounds and numerous superficial wounds consistent with a serrated knife. *Id.* at vol. IV, 957-959, 967. Dr. Yacoub further testified that one of the stab wounds went "deep inside the tissues of the neck" and caused "bleeding inside of the airway." *Id.* at 960. Dr. Yacoub opined that a person with fluid in the airway would not be able to breathe "for

long." *Id.* She also explained that a person can cough fluid out of the airway if they are "conscious enough." *Id.* As Petitioner suggests, this testimony supports an inference that the victim, who had blood in her airway, was not "conscious enough" when she received the stab wound in her neck. But other testimony by the medical examiner supports an inference that the victim could have been conscious when she received at least some of the stab wounds.

Dr. Yacoub testified that she could not discern the order in which the stab wounds were inflicted. *Id.* at 974, 980. And although Dr. Yacoub did not definitively conclude that the victim had defensive wounds, she suggested that it was possible:

> It shows that the stab wound went through the full thickness of the hand. And when we see that, wounds on the hand, that give us, as forensic pathologists, an idea or a clue that this person could sense that something is coming at them and they are trying to protect themselves. They are not – they don't have their hands unable to move at that point.
>
> Possibly, like I said, she had seven stab wounds; but if she had her hand like so, like her hand on her head or on her neck, it is possible that they were only six stab wounds. But this could have been also a separate wound. That's why I counted it as separate.

*Id.* at 968. Dr. Yacoub also described the victim as having a broken fingernail and a broken thumb. *Id.* at 980. Dr. Yacoub did not testify that the victim was conscious during the full length of the attack or for a certain period of time afterward, but neither did she testify that her death was immediate.

Of course, the jury did not only have to rely on the testimony of the medical examiner or eyewitness accounts; they also had the benefit of a surveillance video and Petitioner's own statements to police. During his interview with police detectives, Petitioner stated that the victim said "get off me" and was "trying to get away" while he

was stabbing her. *See* State's Ex. 58 at 33:00. The surveillance video bears this out, as it shows the victim kicking her feet as Petitioner leans over her and repeatedly stabs her. *See* State's Ex. 4. While the surveillance video also shows that the actual stabbing transpired over a quick period of time, the rapid time frame does not render the OCCA's factual determinations unreasonable.[23] There was testimony and other evidence suggesting that the victim called for help and physically resisted the attack by kicking her feet and putting up her hand. Taking the evidence in the light most favorable to the State, (as the state court must under *Jackson*), it is not unreasonable for the OCCA to conclude that the victim suffered a defensive wound, actively resisted the attack for a significant period of time, and was conscious during at least a portion of the attack.

Petitioner also asserts that the OCCA's resolution of his claim was a legally unreasonable application of *Jackson* because there was insufficient evidence of conscious physical suffering to support the HAC aggravator.[24] As previously explained, the OCCA reasonably concluded that the victim experienced at least some conscious physical suffering during the attack. The issue, then, is whether the amount of conscious physical

---

[23] Petitioner also argues that the OCCA made conflicting factual findings when it stated that "the victim's death was not instantaneous" but also described the death as "relatively quick" and her conscious physical suffering as "brief." Petitioner at 89. Petitioner does not explain how these statements are at odds. The fact that the victim's unconsciousness or death occurred quickly is not inconsistent with a finding that the death was not instantaneous.

[24] Petitioner also argues that the OCCA's resolution of Petitioner's *Jackson* claim is contrary to Supreme Court case law because the HAC aggravator is not sufficiently narrowed. As explained in Ground Six, *infra*, the OCCA adopted an approved narrowing construction of the HAC aggravator and applied that narrowing construction in this case. Accordingly, this aspect of Petitioner's subclaim is denied.

suffering the victim endured is sufficient to show "serious physical abuse" in support of the HAC aggravator. In concluding that it was, the OCCA pointed to the "brutality of the injuries" and the "intensity of suffering" caused by the stabbing:

> [a]lthough brief, the conscious physical suffering endured by the victim was extreme and qualitatively separates this case from the many murders where the death penalty was not imposed. The sheer brutality of the injuries, combined with the victim's active and on-going resistance together with the mental anguish of being stabbed repeatedly, further separates this case from virtually all other murders. The total evidence shows the requisite conscious physical suffering to demonstrate that the victim endured serious physical abuse prior to death. As in *Cole*, we find the intensity of suffering caused by the rapidly inflicted injuries here warrants a finding that this evidence of conscious physical suffering and mental anguish was unlike virtually all murders, thereby placing this crime within the narrowed class of individuals for which capital punishment is a valid option.

*Tryon*, 423 P.3d at 651-652. Petitioner disputes this reasoning, arguing that the evidence of the victim's conscious suffering was too brief to support the HAC aggravator.

In support, he relies on *Thomas v. Gibson*, 218 F.3d 1213, 1229 (10th Cir. 2000), where the Tenth Circuit granted relief because there was insufficient evidence of conscious physical suffering. In *Thomas*, there was no direct evidence that the victim was conscious when the injuries were inflicted and, because two of the injuries were inflicted post-mortem, it was unreasonable for the OCCA to infer that the other injuries were not inflicted after the victim became unconscious. *Id.* at 1227-1229. Here, unlike in *Thomas*, there was ample evidence presented, via testimony from eyewitnesses, the medical examiner, and a video recording, that the victim was conscious for the beginning of the attack and at least a portion thereafter.

In any event, the fact that the duration of the victim's conscious physical suffering was brief does not necessarily mean the evidence is insufficient to support the HAC aggravator. In *Cole v. Trammell*, 755 F.3d 1142, 1167 (10th Cir. 2014), the OCCA found the evidence was sufficient to support the HAC aggravator where the medical examiner testified that the victim was conscious for no more than thirty seconds after being injured. The OCCA described the murder and the victim's suffering as follows:

> …we have a crying child who is essentially snapped in two by great force at the hands of her father. She was alive when the painful force was applied and she continued to feel pain for another thirty seconds afterward until she went unconscious and then expired a few minutes later. The amount of force required was great and the stretching before the breaking of the spine and tearing apart of the aorta would have been protracted and not instantaneous.
>
> ***
>
> While [the victim] suffered a fairly quick death, it was far from painless. Indeed, the pain was likely excruciatingly horrible.

*Id.* (quoting *Cole v. State*, 164 P.3d 1089, 1098–99). On appeal, the Tenth Circuit "fully agree[d] with the OCCA that the medical examiner's testimony was sufficient to allow a rational trier of fact to find beyond a reasonable doubt that the murder was especially heinous, atrocious or cruel." *Id.* at 1171. *See also Harjo v. Gibson,* 216 F.3d 1087 (10th Cir. 2000) (finding sufficient evidence to support HAC aggravator even though "the record does not expressly establish when [victim] lost consciousness," because "petitioner stated in his confession that she struggled" and "[t]his shows that she was conscious during the attack and anticipated harm and that death was not instantaneous"); *Jeffers*, 497 U.S. at 783-784 (finding sufficient evidence to support heinous, cruel or depraved aggravator where defendant beat victim after she lost consciousness).

Like in *Cole*, the victim in this case "suffered a fairly quick death," but a reasonable factfinder could nevertheless find beyond a reasonable doubt that the murder was especially heinous, atrocious, or cruel. The victim was alive when the first painful knife wounds were inflicted and there was evidence that she cried out and tried to defend herself during the attack. On the surveillance video, the victim can be seen moving her legs for ten to fourteen seconds after the attack beings. State's Ex. 4. The medical examiner testified that the numerous stab wounds, which cut through clothing, flesh, bone, and internal organs, were inflicted with a high degree of force. Trial Tr. vol. IV, 971-973. She further testified that the stab wounds and superficial cuts would have been painful. *Id.* at 975-976. Certainly, a rational jury could hear all this evidence and conclude that the victim did not experience conscious physical suffering sufficient to support the HAC aggravator. But the evidence does not compel that result. *Hooker v. Mullin*, 293 F.3d 1232, 1243 (10th Cir. 2002) (explaining that "evidence need not compel a jury finding of conscious physical suffering to be constitutionally sufficient."). Taking the evidence in the light most favorable to the State and resolving all conflicting inferences in its favor, a rational jury could also conclude, as it did in this case, that the elements of the HAC aggravator were met.

Although the conscious suffering experienced by the victim was brief, it was accompanied, as it was in *Cole*, by "excruciating pain." *Tryon*, 423 P.3d at 651. The OCCA's finding that there was sufficient evidence to support the aggravator is therefore not based "merely on the brief period of physical suffering necessarily present in virtually all murders," *Medlock v. Ward*, 200 F.3d 1314, 1324 (10th Cir. 2000) (Lucero, J.

concurring), but on the intensity of the pain and the brutality of the injuries that the victim endured while conscious. Given the evidence adduced at trial, and taking *Jackson's* deferential standard into account, the OCCA reasonably concluded that "any rational trier of fact could have found the victim was conscious for a significant portion of the stabbing and that she suffered the requisite torture or serious physical abuse." *Tryon*, 423 P.3d at 652. In making this determination, the Court does not opine as to whether the OCCA's decision is right or wrong. Rather, it concludes only that, under AEDPA, the OCCA's decision is a reasonable application of *Jackson*, i.e. there is room for fairminded disagreement as to its correctness. *Harrington*, 562 U.S. at 101.

Accordingly, Petitioner is not entitled to relief.

### H. Ground Eight: Juror Misconduct

Petitioner argues that juror misconduct and the trial court's refusal to remove certain jurors or declare a mistrial violated his Sixth and Fourteenth Amendment rights to an impartial jury and a fundamentally fair trial. Petitioner's claim is based on comments made by some jurors regarding defense witnesses prior to the case being submitted for deliberation. The comments were made outside of the courtroom and were overheard by an assistant public defender who was not involved in Petitioner's case. Trial Tr. vol. IX, 1114. The OCCA denied the claim on direct appeal. This decision does not amount to reversible error under AEDPA's deferential standard.

### 1. Clearly Established Law

In *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), the Supreme Court held that the right to a jury trial requires that criminal defendants be tried by a panel of impartial jurors and the jury's verdict must be based on evidence developed at trial. The Supreme Court reiterated these principles four years later in *Turner v. Louisiana*, 379 U.S. 466, 472-473 (1965), where it stated that "trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."

In that regard, premature discussions or other "intrajury misconduct generally has been regarded as less serious than extraneous influences on the jury." *United States v. McVeigh*, 153 F.3d 1166, 1186 (10th Cir. 1998), *disapproved of on another grounds by Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999). Further, when the issue of juror impartiality is raised on collateral review, "'[t]he substance of [the] *ex parte* communications and their effect on juror impartiality are questions of historical fact'" on which the state trial court's findings are entitled to deference. *Matthews v. Workman*, 577 F.3d 1175, 1182 (10th Cir. 2009) (quoting *Rushen v. Spain*, 464 U.S. 114, 120 (1983)); *see also Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

### 2. Analysis

The OCCA provided a detailed summary of the events that gave rise to this subclaim and the statements provided by the various individuals involved:[25]

> In the present case, the trial court repeatedly admonished the jury not to discuss the case before releasing the jurors for mid-trial and evening recesses. The record shows Marva Banks, an assistant public defender not involved with Appellant's case, informed the trial court on the fifth day of trial that she heard three jurors (two African American males and a woman with blonde hair) the previous evening discussing witness testimony in the parking garage while they were all waiting for the elevator. Banks testified that two jurors were standing in front of her waiting on the elevator in the parking garage when a third juror approached and said "I've never seen so much orange." At that point, the other two jurors started laughing and one said "Yeah, there were so many family members that showed up in orange and it didn't help." Banks said the jurors' reference to "orange" was to jail orange. According to Banks, one of the jurors asked "where was his mother? That would have helped."

> Notably, the last three witnesses before this purported incident were Eric Wilson, Roy Tryon, and Rico Wilson—Appellant's cousin, father and brother respectively. All three of these witnesses were in custody, and wearing orange jail garb, when they took the witness stand. Based on Banks's description of the three jurors, the trial court and parties questioned Juror C.E., Juror R.G. and Alternate Juror C.S. When R.G. was brought in for questioning, Banks stated R.G. was not the female juror involved. R.G. was then returned to the jury room without being questioned. Juror C.E. was brought in next and admitted saying "I couldn't believe there was [sic] so many people in orange coming today." However, C.E. denied saying this on the way to the elevator or in the parking lot. Instead, he claimed to have made this comment upstairs in the courthouse the day before when the jurors were leaving as one of the witnesses in orange was also getting on an elevator to leave. C.E. testified that the man in orange had a "weird" stare.

> When asked by Judge Truong whether, when C.E. left the day before, he rode with anyone in the elevator on the way to his car, C.E. responded that he rode with Juror R.G. C.E. explained that he was waiting at the elevator

---

[25] Although the OCCA's factual summation is lengthy, the Court believes it is necessary to reproduce it in full because it is a thorough recitation of the statements made to the trial court.

with R.G. and then rode the elevator up with her and some other people. C.E. denied discussing anything about the case. When asked whether anyone mentioned too many people in orange or said they wished the mother was there, C.E. replied "[n]o, not during there." C.E. then immediately corrected himself and recalled that he "did say I wish the mother would have got up here."

In follow-up questioning, the prosecutor asked whether C.E. had predetermined the outcome of the case; C.E. said no. When asked to explain what precipitated the comment about people being in orange, C.E. said it was because of the behavior of the person in orange. C.E. acknowledged too that the defense had no burden of proof and had no obligation to present any witnesses. When asked by the defense with whom he was discussing all the orange, C.E. responded "I had just said it out loud ... I just said that was a lot of orange." When asked whether there was discussion to the effect that all the orange didn't help the client, C.E. denied having any such conversation or ever saying it. However, one of the other jurors—he believed Juror J.L.— in response to his comment about all the orange told him "shh." Additionally, C.E. said he made the comment about wishing they had heard from the mother to Juror R.G. When C.E. made the comment, he said R.G. "just didn't say nothing. She just kind of looked at me and just acknowledged that I said something and that was it." C.E. denied that any other male jurors were present.

Alternate Juror C.S. did not recall walking the night before with Jurors C.E. and R.G. to the parking garage. C.S. denied saying to the other jurors anything about having made up his mind on the case. Nor had he talked to the other jurors about the case. C.S. also did not remember hearing the other jurors talk about the case. C.S. testified that he had not made up his mind on the case because he had not yet heard all the evidence.

Banks never identified C.S. as one of the people involved in the conversation with C.E. At the conclusion of C.S.'s testimony, defense counsel stated that Banks thought the other male involved in the conversation may have been Juror Q.A. The prosecutor noted too that Banks gestured in a manner indicating she was not sure it was C.S. when he first entered the room. When Q.A. was questioned, he testified C.E. did walk ahead of him on the way to the parking garage the night before. Q.A. did not, however, hear C.E. talking. Nor had he heard any of the jurors discussing the case or indicating that they had reached a verdict. Q.A. denied doing the same. When asked by defense counsel whether Q.A. heard any of the jurors discussing what they saw yesterday as they were leaving, Q.A. responded that he only saw "some shaking of heads, but no discussion." Q.A. clarified that no one was shaking their heads to each other but only in "self-contemplation" just

as some had done when they were sitting in the jury box listening to the testimony. Q.A. clarified no one was talking about the case or deliberating in any way when they were shaking their heads.

Juror R.G. was the last juror questioned. R.G. denied discussing the case with anyone on the jury. Nor had R.G. heard other jurors talking about the case in her presence. R.G. admitted using the elevators in the parking garage the previous evening but denied hearing anyone talking about orange. R.G. could not remember other jurors being around her as she walked to the parking garage. R.G. explained she "want[s] to leave here as soon as possible when I'm done at the end of the day. I don't look or talk to anybody. I just want to get the heck out of here." R.G. testified the trial had been "very intense" and she "just want[s] to leave" after court each day. Hence, R.G. could not recall who she was with yesterday as she left. Nor did she hear any conversations.

The parties agreed to remove Juror C.E. based on his violation of the court's admonishment not to talk about the case. The trial court granted that request. C.E. was replaced by Alternate Juror C.S., the first alternate juror. Defense counsel objected because she said Banks thought C.S. looked closer to the man she saw than Juror Q.A. Defense counsel urged that the second alternate juror replace C.E. instead. Defense counsel also requested R.G. be removed from the panel. The trial court overruled Appellant's objection as to C.S. because he heard nothing and had not discussed the case with anyone. The trial court likewise denied Appellant's challenge to R.G., concluding that even if C.E. had been talking to R.G., her testimony makes clear she was not paying any attention. The trial court observed R.G.'s testimony that all she cared about was going home at the time and noted too that there was no evidence C.E. and R.G. had been discussing anything. Unsuccessful in his quest to remove C.S. and R.G., Appellant requested a mistrial which was also denied.

*Tryon,* 423 P.3d at 641-642. The OCCA found that the record supported the trial court's findings, the removal of C.E cured any possible prejudice arising from his admitted misconduct, and the trial court did not abuse its discretion in refusing to remove the other jurors or in denying Petitioner's motion for mistrial. *Id.* at 643.

Petitioner asserts that the OCCA made three unreasonable determinations in denying his claim: (1) R.G's "testimony makes clear she was not paying any attention", (2)

73

"there was no evidence C.E. and R.G. had been discussing anything", and (3) "[t]he removal of C.E. cured any possible prejudice arising from his admitted misconduct." Petition at 94-95. In disputing these conclusions, Petitioner relies on the testimony of Ms. Banks and a statement by the trial judge suggesting that Ms. Banks's testimony may be biased given her employment with the public defender's office.

Although the testimony of Ms. Banks is not entirely consistent with the testimony of the involved jurors, it hardly renders the trial court's assessment of the juror's credibility or impartiality erroneous. *See United States v. Wacker*, 72 F.3d 1453, 1467–68 (10th Cir. 1995), modified (Mar. 11, 1996) ("Because the district court is in the best position to judge the effect of improper statements on a jury and the sincerity of the jurors' pledge to abide by the court's instructions, its assessment is entitled to great weight."). Nor does it render the OCCA's findings unreasonable, particularly given the deference owed to the state court's factual findings. *See Rushen,* 464 U.S. at 120; 28 U.S.C. § 2254(d)-(e). R.G. categorically denied discussing the case with anyone or overhearing other jurors discuss the case. Trial Tr. vol. V, 1140-1142. C.E., who admitted to making some statements about the case, testified that R.G. said nothing in response to him and just looked at him and said "hmmm." *Id.* at 1127-1129. Although Ms. Banks stated that she heard some brief back and forth conversation between certain jurors, she could not affirmatively identify R.G. as making any statements and was not even sure if R.G. was one of the jurors she saw. *Id.* at 1120, 1143. Accordingly, a reasonable jurist could conclude that R.G. was not discussing anything with other jurors and there was no evidence that C.E. and R.G. engaged in a discussion.

A reasonable jurist could likewise conclude that the removal of C.E. cured any possible prejudice arising from his misconduct. C.E. was the only juror who admitted to violating the trial court's admonishment not to talk about the case and was therefore the only juror who engaged in any misconduct. As the OCCA reasonably concluded that the evidence failed to show that R.G. or C.S. discussed the case with anyone, let alone predetermined the outcome such that they could not remain impartial, the removal of the lone juror who engaged in misconduct was adequate to cure any possible prejudice arising from the comments. *See Howell v. Trammell,* 728 F.3d 1202, 1214 (10th Cir. 2013) (holding that OCCA did not contravene clearly established law when it denied the claim based on juror's conversation with court deputies); *Matthews*, 577 F.3d at 1182 (denying habeas relief for a claim based on juror's conversation with former alternate juror); *Wacker*, 72 F.3d at 1466-1467 (holding that removal of venireperson who had discussed certain trial-related matters with three other venirepersons cured any possible prejudice).

Petitioner identifies *Irvin* and *Turner* in support of his claim, but these cases do not demand a different result. *Irvin* dealt with the influence of adverse pretrial publicity on the jury, 366 U.S. at 724-727, while *Turner* addressed jurors' conversations with two deputy sheriffs who escorted the jury but also served as witnesses at trial. 379 U.S. at 466-468. These cases recognized a criminal defendant's right to an impartial jury that renders a verdict based on the evidence presented at trial, but neither of them addressed the impact of premature intrajury discussions.

When identifying and applying clearly established federal law for purposes of AEDPA, lower courts must be wary of generalizing too broadly from Supreme Court

precedents. *See Van Patten*, 552 U.S. at 126; *Musladin*, 549 U.S. at, 77; *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005); *see also House*, 527 F.3d at 1015  (explaining that "Supreme Court holdings…must be construed narrowly and consist only of something akin to on-point holdings."). Unlike in *Irvin* or *Turner*, this case does not present a situation where an extraneous influence was brought to bear on the jury. Accordingly, the OCCA did not unreasonably apply any clearly established federal law in rejecting Petitioner's claim that the trial court's refusal to grant a mistrial or remove certain jurors denied him a fair trial.

The Court cannot conclude that the OCCA's decision is unreasonable under AEDPA's deferential standard. Petitioner is not entitled to relief.

### I. Ground Nine: Cumulative Ineffective Assistance of Counsel Claims

Petitioner's ninth ground for relief includes a list of trial and appellate counsel's purported failures and urges the Court to consider all of these failures cumulatively and in the context of the entire record when evaluating his ineffective assistance of counsel claims. As Respondent points out, some of the alleged ineffectiveness claims listed by Petitioner in this ground for relief are procedurally barred[26] or undeveloped.[27]

In any event, *Strickland* requires "a court hearing an ineffectiveness claim [to] consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 696.

---

[26] Procedurally barred claims do not factor into the overall assessment of counsel's effectiveness. *Cuesta-Rodriguez*, 916 F.3d at 916.

[27] Petitioner's claim that counsel was ineffective for failing to object to the limitation on mitigation evidence and his claim that counsel was ineffective for failing to ensure that witnesses were dressed in street clothing was merely raised in a footnote. These types of conclusory statements and undeveloped arguments are not sufficient to overturn a judgment. *Grant*, 727 F.3d at 1025.  However, the result is the same even if these alleged errors are put in the mix.

The decision to grant relief on an ineffectiveness claim must be "a function of the prejudice flowing from all of counsel's deficient performance." *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003). Thus, "considering the cumulative prejudicial effect of counsel's numerous errors is an inherent part of the prejudice inquiry." *Wood v. Carpenter*, 907 F.3d 1279, 1302 (10th Cir. 2018).

As part of its evaluation of the various ineffectiveness claims raised by Petitioner, the Court has inherently considered the prejudicial impact of all the alleged errors together. Further, in the AEDPA context, the Court must assume that the state court considered the cumulative prejudicial effect of all alleged errors by counsel. *Wood*, at 907 F.3d at 1302. Petitioner's perfunctory discussion in Ground Nine does not persuade the Court that, considering the totality of the evidence, the cumulative effect of the alleged errors prejudiced him. Ground Nine is denied.

### J. Ground Ten: Independent Reweighing of the Aggravating and Mitigating Evidence

Petitioner argues that the OCCA's independent reweighing of the aggravating and mitigating evidence following the invalidation of one of the aggravators violated the Sixth Amendment and was contrary to Supreme Court precedent. In *McKinney v. Arizona*, ___ U.S. ___, 140 S. Ct. 702, 709 (2020), the Supreme Court held that a state appellate court may conduct a "reweighing of aggravating and mitigating circumstances, and may do so in collateral proceedings as appropriate and provided under state law."[28] *See also Clemons v. Mississippi*, 494 U.S. 738, 741 (1990) (holding that "the Federal Constitution does not

---

[28] *McKinney* was decided after Petitioner submitted his brief in chief.

prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review.").

Petitioner's argument is foreclosed by *McKinney*. The OCCA's reweighing of the aggravating and mitigating circumstances did not in and of itself amount to a constitutional violation and Petitioner is not entitled to relief.

### K. Ground Eleven: Cumulative Error

In his final ground for relief, Petitioner argues that the accumulation of errors violated his rights under the Sixth, Eighth, and Fourteenth Amendments. The cumulative error analysis addresses the possibility that two or more individually harmless errors might have a cumulative effect on the outcome of the trial. *Mullin*, 342 F.3d at 1116. This analysis "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id*. (quoting *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002)). To obtain habeas relief, the court must find that "the cumulative effect of the errors determined to be harmless had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Instances where courts find deficient performance by counsel must also be aggregated, even if the ineffectiveness claim was ultimately denied for insufficient prejudice. *Cargle v. Mullin*, 317 F.3d 1196, 120 (10th Cir. 2003). However, claims that

have been procedurally defaulted are not considered a cumulative error analysis. *Cuesta-Rodriguez*, 916 F.3d at 916.

The OCCA found no cumulative error on direct appeal or post-conviction review. *Tryon*, 423 P.3d at 655; *Tryon*, PCD-15-378, slip op. at 21-22. This Court also found no constitutional error. Accordingly, Petitioner is not entitled to relief.

### IV.  Motions for Discovery and Evidentiary Hearing

Petitioner has filed a motion for discovery seeking all district attorney files, documents that impeach certain witnesses, documents related to a jail fight involving Petitioner, documents related to certain witnesses, documents related to domestic violence cases involving Petitioner, and documents related to a separate assault on the victim. He also seeks information regarding possible plea negotiations, procedures for employing experts, and whether other employees discussed the performance of one Petitioner's trial attorneys. Petitioner fails to provide any argument as to why discovery on these topics is necessary or what grounds for relief the requested discovery may support. From what the Court can discern, the bulk of Petitioner's requests mainly relate to claims that are either procedurally barred or not raised. Therefore, Petitioner has not shown good cause for discovery. *See* Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts (requiring good cause to obtain discovery authorization).

In addition to his discovery request, Petitioner has also filed a motion for evidentiary hearing to develop evidence related to his ineffective assistance of counsel claims. "The purpose of an evidentiary hearing is to resolve conflicting evidence." *Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 860 (10th Cir. 2005). If there is no conflict, or if the claim can

be resolved on the record before the Court, then an evidentiary hearing is unnecessary. *Id.* at 859. An evidentiary hearing is unwarranted to resolve the legal issues presented by Petitioner's Petition for Writ of Habeas Corpus. No information gained from an evidentiary hearing would affect the legal findings on those grounds. Therefore, the request for an evidentiary hearing is denied.

## V.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief. Accordingly, Petitioner's Petition [Doc. 27], motion for discovery [Doc. 29], and motion for an evidentiary hearing [Doc. 42] are hereby **DENIED**. A separate judgment will be entered accordingly.

IT IS SO ORDERED this 19th day of July, 2021.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE